684 A.2d 1338

**Leonard POLOMSKI**

v.

**MAYOR & CITY COUNCIL OF BALTIMORE**

No. 140, Sept. Term, 1995.

Court of Appeals of Maryland.

Nov. 21, 1996.

David E.C. Grant (John E. Kelly, John E. Kelly, P.A., on brief), Bel Air, for Petitioner.

David B. Allen, Principal Counsel, Herbert Burgunder, Jr., Senior Solicitor (Neal M. Janey, City Solicitor; Stanley C. Rogosin, Associate Solicitor, all on brief), Baltimore, for Respondent.

Argued before ROBERT C. MURPHY,* C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

KARWACKI, Judge.

In this case, we construe Maryland Code (1991 Repl.Vol., 1996 Cum.Supp.), § 9–503(d)(2) of the Labor and Employment

---

* Murphy, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court, after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of the opinion.

Article,[1] the so-called "offset provision" of § 9–503 of the Maryland Workers' Compensation Act (hereinafter "Workers' Compensation Act" or "the Act"). Specifically, we are asked the narrow question of whether § 9–503(d)(2) requires the reduction of workers' compensation benefits for a disability caused by an occupational disease paid to a retired fire fighter who is also receiving retirement benefits under a service pension plan. We shall hold that it does not affirm the judgment of the Court of Special Appeals.

## I.

The facts are undisputed. After working as a Baltimore City fire fighter for nearly 38 years, Leonard Polomski was earning a weekly wage of $676.32. On September 4, 1992, Polomski applied for, and received, a "time-earned" service retirement, effective March 3, 1993, for which he was compensated at the biweekly rate of $1,128.69, or $564.35 per week.[2] Shortly thereafter, Polomski also applied for workers' compensation benefits for heart disease, hypertension, and lung ailments under § 9–503(a), which provides in pertinent part:

> "(a) *Heart disease, hypertension, and lung disease—Fire fighters, fire fighting instructors, and rescue squad members.*—A paid fire fighter or paid fire fighting instructor employed by an airport authority, a county, a fire control district, a municipality, or the State or a volunteer fire fighter, volunteer fire fighting instructor, or volunteer rescue squad member who is a covered employee under § 9–234 of this title is presumed to have an occupational disease that was suffered in the line of duty and is compensable under this title if:

---

1. Unless otherwise indicated, all statutory references in this opinion will be to the Maryland Workers' Compensation Act. Maryland Code (1991 Repl.Vol., 1996 Supp.), §§ 9–101 through 9–1201 of the Labor and Employment Article.

2. Polomski was born on June 10, 1931. Despite his intention to work until age 65, Polomski's medical condition precluded him from performing most of his fire fighting duties. Upon his March 3, 1993 retirement, he was 62 years of age.

(1) the individual has heart disease, hypertension or lung disease;

(2) the heart disease, hypertension, or lung disease results in partial or total disability or death; . . . ."

The Workers' Compensation Commission (hereinafter "Commission") concluded that Polomski "sustained an occupational disease . . . arising out of and in the course of his employment; and [allowed his] claim for temporary total disability from September 4, 1992 to February 4, 1994 inclusive; subject to a credit for wages paid." [3] The Commissioner ordered Baltimore City to pay Polomski the unadjusted rate of $451.00 per week beginning February 5, 1992 for the period September 4, 1992 to February 4, 1994. The Mayor and City Council of Baltimore ("the City") appealed that Order to the Circuit Court for Baltimore City, contending Polomski's workers' compensation benefits were limited to $111.97 by § 9–

---

**3.** Although it is unclear from the record precisely when Polomski filed his claim with the Workers' Compensation Commission, the hearing on the matter was held July 19, 1994. Benefits were paid to Polomski under §§ 9–618 and 9–621, which are contained in "Part III. Temporary Total Disability" of the Workers' Compensation subtitle.

Section 9–618, entitled **"Scope of Part,"** directs that

"A covered employee who is temporarily totally disabled due to an accidental personal injury or occupational disease shall be paid compensation in accordance with this Part III of this subtitle." Section 9–621, entitled **"Payment of Compensation,"** provides:

"(a) *Amount of payment.*—(1) Except as provided in paragraph (2) of this subsection, if a covered employee is temporarily disabled due to an accidental personal injury or an occupational disease, the employer or its insurer shall pay the covered employee compensation that equals two-thirds of the average weekly wage of the covered employee, but:

(i) does not exceed the average weekly wage of the State; and

(ii) is not less than $50.

(2) If the average weekly wage of the covered employee is less than $50 at the time of the accidental personal injury or the last injurious exposure to the hazards of the occupational disease, the employer or its insurer shall pay the covered employee compensation that equals the average weekly wage of the covered employee.

(b) *Duration of payment.*—The employer or its insurer shall pay the compensation for the period that the covered employee is temporarily totally disabled."

503(d)(2).[4]

The circuit court affirmed the Order of the Commission. The City appealed that judgment to the Court of Special Appeals. The intermediate appellate court reversed, holding that the clear language of § 9–503(d)(2) expressly requires the Commissioner to reduce Polomski's workers' compensation award so that, when combined with his "retirement benefits," his payments would not exceed his weekly salary earned while still employed as a fire fighter. *Mayor & City Council of Baltimore v. Polomski,* 106 Md.App. 689, 666 A.2d 895 (1995). We issued a writ of certiorari to determine the application of § 9–503(d)(2) to the facts of the instant case.

## II.

In construing any statute, our principal mission is to effectuate the intent of the Legislature. *Bowen v. Smith,* 342 Md. 449, 454, 677 A.2d 81, 83 (1996); *Soper v. Montgomery County,* 294 Md. 331, 335, 449 A.2d 1158, 1160 (1982). The primary source of that intent is the language of the statute itself. *Bowen,* 342 Md. at 454, 677 A.2d at 83. Where the legislative will is not immediately apparent from the language of the statute, we employ the canons of statutory construction to guide our inquiry. *See, e.g., Kaczorowski v. Mayor & City Council of Baltimore,* 309 Md. 505, 511–16, 525 A.2d 628 (1987) (and cases cited therein).

When, however, the language of the statute is clear, further analysis of legislative intent ordinarily is not required, *Rose v. Fox Pool,* 335 Md. 351, 359, 643 A.2d 906, 910 (1994); *Scaggs v. Baltimore & W.R. Co.,* 10 Md. 268 (1856), and we give the words of the statute their ordinary and common meaning within the context in which they are used, *Kaczorowski,* 309 Md. at 514, 525 A.2d at 632. This, of course, is done

---

4.  Section 9–503(d)(2) provides in pertinent part:
    "The benefits received under this title shall be adjusted so that the weekly total of those benefits and retirement benefits does not exceed the weekly salary that was paid to the fire fighter...."

while keeping in mind the overall purpose of the Act being construed, for legislative purpose is the context in which words of a statute are used. *Id.* at 516, 525 A.2d at 633. Cognizant of these principles, we now turn to the objectives of the Workers' Compensation Act and to the language of § 9–503(d)(2).

## III.

By Chapter 800 of the Acts of 1914, the Maryland Workers' Compensation Act was enacted into law in this State. Since that time, the Act has gone through several revisions, reflecting both changes in societal attitudes, workplace realities, and, of course, political compromises.[5] Despite some peripheral sparring over the proper aims of the Act and the role of the Commission, the core values that prompted this beneficial legislation have never been abandoned. Although the Act's name suggests that it was intended solely for the benefit of employees, the preamble to the 1914 Act, and, indeed, our previous holdings, reveal otherwise.

In reality, the Act protects employees, employers, and the public alike. To be sure, the Act maintains a no-fault compensation system for employees and their families for work-related injuries where compensation for lost earning capacity is otherwise unavailable. *See Bethlehem–Sparrows Point Shipyard v. Damasiewicz,* 187 Md. 474, 480, 50 A.2d 799, 802 (1947); *Paul v. Glidden Co.,* 184 Md. 114, 119, 39 A.2d 544, 546 (1944). At the same time, however, the Act also recognizes the need to protect employers from the unpredictable nature and expense of litigation, and the public from the overwhelming tax burden of "caring for the helpless human wreckage found [along] the trail of modern industry." *Liggett*

---

5. The Maryland Workers' Compensation Commission, as we know it today, came into existence by Chapter 584, § 1 of the Acts of 1957, codified and amended at former Md.Code (1957, 1964 Cum.Supp.), Art. 101, § 1. Prior to the 1957 amendments, the Commission was known as the *State Industrial Accident Commission.* Ch. 800, § 1 of the Acts of 1914, originally codified at Md.Code (1914), Art. 101, § 1.

*& Meyers Tobacco Company v. Goslin*, 163 Md. 74, 80, 160 A. 804, 807, (1932); *Brenner v. Brenner*, 127 Md. 189, 192, 96 A. 287, 288 (1915). *See* Ch. 800 of the Acts of 1914; *see also Belcher v. T. Rowe Price*, 329 Md. 709, 736–37, 621 A.2d 872, 885–86 (1993). In other words, the Act provides employees suffering from work-related accidental injuries, regardless of fault, with a certain, efficient, and dignified form of compensation. In exchange, employees abandon common law remedies, thereby relieving employers from the vagaries of tort liability. *Belcher*, 329 Md. at 736, 621 A.2d at 885 (citing 1 Arthur Larson, *The Law of Workmen's Compensation*, § 1.20 at 2 (1992)).[6]

Of course, twenty-five years of experience brought inevitable maturity to the Act, and the Legislature eventually recognized that accidents were not the sole cause of employee harm. By Chapter 465 of the Acts of 1939, certain occupational diseases [7] were deemed compensable if contracted during the course of employment. The 1939 amendments to the Act entitled employees disabled or killed by specific enumerated occupational diseases to compensation "as if such disablement or death were an injury by accident." Ch. 465, § 32B of the Acts of 1939. Prior to that time, occupational diseases were not compensable. *Gunter v. Sharp & Dohme*, 159 Md. 438, 445–46, 151 A. 134, 137–38 (1930). *But see State v. North East Fire Brick Co.*, 180 Md. 367, 369–70, 24 A.2d 287, 288 (1942); *Victory Sparkler Co. v. Francks*, 147 Md. 368, 378–80, 128 A. 635, 638–39 (1925) (holding that, although occupational diseases are not compensable, employer negligence may render the disease "accidental" and bring the injury within the provisions of the Act). Eventually, the practice of enumerating

---

**6.** In addition to wage loss protection, the Act also affords employees medical benefits, §§ 9–660 to 9–664, the opportunity for vocational rehabilitation, §§ 9–670 to 9–675, and, in the event of death, dependent survivor benefits, §§ 9–678 to 9–686, and allowances for funeral expenses, § 9–689.

**7.** As a historical note, Chapter 465 of the Acts of 1939 was the first time that the Maryland Legislature recognized, *inter alia,* asbestosis as an occupational disease.

specific diseases was abandoned, and all occupational diseases [8] were, subject to certain conditions not here relevant, deemed compensable. *See* Ch. 528 of the Acts of 1951, now codified and amended as Md.Code (1991 Repl.Vol., 1996 Supp.) § 9–502 of the Labor and Employment Article. As with accidental injuries, the burden of proving a disease as occupational generally fell to the claimant. *See generally* § 9–101.

A little more than three decades after its formal recognition of occupational diseases, the General Assembly turned its attention to certain fire fighters, concluding that they were susceptible to diseases formerly not recognized as occupational. *See Board of County Commr's for Prince George's County v. Colgan,* 274 Md. 193, 208, 334 A.2d 89, 97 (1975) (holding that the Legislature may properly determine that fire fighters are exposed to health hazards not shared by other government employees); *Soper, supra,* 294 Md. at 335–36, 449 A.2d at 1160. By Chapter 695 of the Acts of 1971, the Legislature amended the Act and granted a presumption of compensability in favor of certain classes of fire fighters suffering from heart or lung disease, or hypertension. *Big Savage Refractories Corp. v. Geary,* 209 Md. 362, 366, 121 A.2d 212, 214 (1956) (heart trouble is not an occupational disease). The amendment was first codified as Md.Code (1957, 1971 Cum.Supp.), Article 101, § 64A. In 1972, the scope of § 64A was expanded to include certain police officers as well, Ch. 282 of the Acts of 1972, and is currently codified and amended as § 9–503(a)–(b).

Maryland Code (1957, 1971 Cum.Supp.), Art. 101, § 64A, incorporated a provision, later codified as Md.Code (1957, 1985 Repl.Vol., 1991 Cum.Supp.), Art. 101, § 64A(b), which read:

"The benefits received under this article however, shall be adjusted so that the total of all weekly benefits shall not

---

**8.** In *Victory Sparkler Co. v. Francks,* 147 Md. 368, 379, 128 A. 635, 638 (1925), this Court, for the first time, defined an occupational disease as "one which arises from causes incident to the profession or labor of the party's occupation or calling. It has its origin in the inherent nature or mode of work of the profession or industry, and it is the usual result or concomitant."

exceed one hundred percent of the weekly salary which was paid to said fire fighter."

This statutory language remained unchanged until its recodification into what is now Title 9 of the Labor and Employment Article. By Chapter 8, § 2 of the Acts of 1991, Art. 101, § 64A(b) was recodified as § 9–503(d)(2). Although the revisor's note to § 9–503 indicates it was adopted without substantive change, slight word changes were in fact made to § 9–503(d)(2), and are underscored as follows:

"The benefits received under this title shall be adjusted so that the weekly total of *those benefits and retirement benefits does not exceed the weekly salary that was paid to the fire fighter....*"

This brings us to the heart of the present controversy.

### IV.

Polomski principally contends that § 9–503(d)(2) only applies when workers' compensation benefits and retirement benefits are the result of the same disabling event. When, however, retirement benefits arise by virtue of age and length of service, a claimant suffering from an occupational disease is entitled to the full measure of both workers' compensation benefits and retirement benefits, without reduction or offset. We disagree.

Although the precise issue Polomski now raises has not been previously addressed by this Court, we have had several opportunities to consider the offset provision applicable to unspecified employees of governmental units or quasi-public corporations contained in former Md.Code (1957, 1985 Repl. Vol., 1991 Cum.Supp.), Art. 101, § 33(d). That section provided, in pertinent part:

"(d) Whenever by statute, charter, ordinances, resolution, regulation or policy adopted thereunder, whether as part of a pension system or otherwise, any benefit or benefits are furnished employees of employers covered under

§ 21(a)(2)[9] of this article, the dependents and others entitled to benefits under this article as a result of the death of such employees, the benefit or benefits when furnished by the employer shall satisfy and discharge pro tanto or in full as the case may be, the liability or obligation of the employer and the Subsequent Injury Fund for any benefit under this article. *If any benefits so furnished are less than those provided for in this article the employer or the Subsequent Injury Fund, or both shall furnish the additional benefits as will make up the difference between the benefit furnished and the **similar** benefit required in this article . . .*" (Emphasis added).

Article 101, § 33(d) is currently codified as § 9–610(a)(1)–(2). Ch. 8, § 2 of the Acts of 1991.

We have previously observed that the meaning of Art. 101, § 33(d) is unmistakably clear.[10] The Legislature intended that injured government employees covered by both a pension plan and the Act receive only a single recovery for a single injury. *Fikar v. Montgomery County*, 333 Md. 430, 435, 635 A.2d 977, 979 (1994); *Newman v. Subsequent Injury Fund*, 311 Md. 721, 725, 537 A.2d 274, 275 (1988); *Frank v. Baltimore County*, 284 Md. 655, 659, 399 A.2d 250, 253 (1979); *see also Potter v. Bethesda Fire Dep't*, 309 Md. 347, 365, 524 A.2d 61, 69–70 (1987); *Feissner v. Prince George's County*, 282 Md.

---

9. Md.Code (1957, 1985 Repl.Vol., 1991 Cum.Supp.), Art. 101, § 21(a)(2) subjects "[t]he State, any agency thereof, and each county, city, town, township, incorporated village, school district, sewer district, drainage district, public or quasi public corporation, or any other political subdivision of the State that has one or more employees subject to this article" to the provisions of the Workers' Compensation Act. *See also Potter v. Bethesda Fire Dep't*, 309 Md. 347, 355, 524 A.2d 61, 64 (1987) (holding that legislative intent of § 21(a)(2) was to scoop all the various and sundry government bodies and make them employers within the contemplation of the Act).

10. Md.Code (1957, 1985 Repl.Vol., 1991 Cum.Supp.), Art. 101, § 33(c) was renumbered as § 33(d) by Ch. 559 of the Acts of 1989. Cases occurring before the July 1, 1989 effective date of the amendment refer to § 33(c) rather than § 33(d). The two provisions are virtually identical. *See also Fikar v. Montgomery County*, 333 Md. 430, 433 n. 3, 635 A.2d 977, 978 n. 3 (1994).

413, 421, 384 A.2d 742, 747 (1978); *Mazor v. State Dep't of Correction,* 279 Md. 355, 363, 369 A.2d 82, 88 (1977). The purpose of Art. 101, § 33(d) was to preclude an employee from " 'double dipping into the same pot of comparable benefits.' " *Newman,* 311 Md. at 728, 537 A.2d at 277. That is to say, similar benefits for the same injury trigger the offset provision of Art. 101, § 33(d). *Id.* at 724, 537 A.2d at 275. Dissimilar benefits, therefore, render the offset provision inapplicable. *Id.* at 728, 537 A.2d at 277.

For example, in *Fikar,* a correctional officer was injured in the course of her employment and permanently disabled. As a result, she obtained a service-related disability retirement. We concluded that her vocational rehabilitation benefits were *dissimilar* to her disability retirement payments and that her employer, Montgomery County, was not entitled to offset her disability payments against the value of her vocational rehabilitation benefits. *See* Art. 101, § 36(8)(c)(i). We also concluded, however, that, to the extent the *Montgomery County Code* mandated cash payments as part of vocational rehabilitation for wage replacement purposes, those payments were similar to disability payments and therefore subject to the offset provision of Art. 101, § 33(d). 333 Md. at 438–39, 635 A.2d at 981; *see also* Montgomery Code (1984, as amended), Art. III, § 33–43(e).

In *Newman,* a Prince George's County employee suffered a work-related permanent partial disability and received workers' compensation benefits as a result. Two months subsequent to her award, she retired, and, having served the county for twenty years, became eligible for benefits under the county's pension plan. We concluded that her workers' compensation benefits and retirement benefits were dissimilar and held the offset provision of Art. 101, § 33 inapplicable.

Polomski seeks safe harbor in the above line of cases in order to save his workers' compensation award from the offset requirements of § 9–503(d)(2). As we shall explain, such reliance is misplaced.

## V.

■ As indicated in Part II., *supra,* Polomski took advantage of a statutory presumption of compensability for his heart disease in favor of paid fire fighters provided by § 9–503(a). That section of the Workers' Compensation Act, however, by its very terms, requires that "benefits received under [the workers' compensation] title shall be adjusted so that the weekly total of those benefits *and retirement benefits* does not exceed the weekly salary that was paid to the fire fighter." § 9–503(d)(2) (emphasis added). Notwithstanding the plain language of § 9–503(d)(2), Polomski urges this Court to adopt the reasoning of those cases construing former Art. 101, § 33(d) and its predecessors. That is to say, because his retirement benefits are service-related and not the result of an occupational injury, he is entitled to the full measure of both.

Our cases construing former Art. 101, § 33(d) relied heavily, if not exclusively, upon the "similar benefits" language employed in that statute. *See* Part IV., *supra.* Section 9–503(d)(2) and its predecessors, notwithstanding years of revision and recodification, have never employed the "similar benefits" language. It is, therefore, reasonable to conclude that because the two statutes say different things, they mean different things, notwithstanding Polomski's importuning to the contrary. Unlike Art. 101, § 33(d), § 9–503(d)(2) and its predecessors make no distinction between retirement benefits accruing by reason of age and service versus those accruing as the result of a disability, and no reasonable inference to that effect can be drawn from the section's clear language.

Polomski argues that a literal reading of § 9–503(d)(2) would run contrary to the legislative intent of requiring a setoff only when an employee's retirement and workers' compensation benefits accrue as the result of the same disabling event. As we have said, however, that intent has only been expressed in Art. 101, § 33(d) and its predecessors. Moreover, Polomski overlooks the possibility that the offset required by § 9–503(d)(2) could very well have been the result of a compromise between fire fighters seeking a presumption of

compensability and municipal employers seeking to protect the public coffers. Such a compromise would have been perfectly consistent with the goals of the Workers' Compensation Act. *See* Part III., *supra.*

In any event, Polomski maintains that it would be unfair to conclude that, unlike other public employees, a fire fighter stricken with an occupational disease compensable under § 9–503(a) is otherwise precluded from receiving the full measure of his service retirement and workers' compensation benefits. Without passing upon the wisdom of § 9–503(d)(2) and its relative fairness, we can only observe that the Legislature is not required to treat all public employees in relation to their pension and retirement benefits similarly. *Hargrove v. Board of Trustees of the Maryland Retirement Sys.,* 310 Md. 406, 424, 529 A.2d 1372, 1381 (1987) (and cases cited therein). Indeed, § 9–503(a) limits its application to "fire fighters, fire fighting instructors, and rescue squad members"—a specific class of public employees. Polomski offers no reason why the Legislature can treat him differently from other public employees in § 9–503(a), but not in § 9–503(d)(2), and we discern none.

Moreover, Polomski's reading of § 9–503(a) would necessarily render it superfluous to the Workers' Compensation Act. Section 9–610 applies to *all* employees of governmental units and quasi-public corporations, including, presumably, fire fighters. If § 9–503(d)(2) and § 9–610(a)(1)–(2), are synonymous, § 9–503(d)(2) has no purpose. We will not read any part of a statute to be superfluous. *See, e.g., Schlossberg v. Citizens Bank of Maryland,* 341 Md. 650, 660, 672 A.2d 625, 629 (1996); *Thomas v. Police Comm'r of Baltimore City,* 211 Md. 357, 361, 127 A.2d 625, 627 (1956). The same principle should apply when construing an entire act, and we will, therefore, not read any portion of the Workers' Compensation Act to be mere surplusage.

The only occasion this Court has had to consider the offset provision of Art. 101, § 64A(b) was in *Harris v. Mayor & City Council of Baltimore,* 306 Md. 669, 511 A.2d 52 (1986). In

*Harris,* three Baltimore City fire fighters retired under the disability provisions of former Art. 101, § 64A, now § 9–503(a). We there held that the unambiguous language of Art. 101, § 64A(b), like that of the offset provision of Art. 101, § 33, clearly expressed the legislative policy of providing one recovery for one wage loss as the result of a disability, and that the statute clearly required the claimants' workers' compensation awards be reduced by their retirement allowances. Notwithstanding its recodification in Title 9 of the Labor and Employment Article, the offset provision of former Art. 101, § 64A(b) is no less clear today. Polomski insists that his retirement benefits are not wage-loss benefits, but rather deferred compensation for his nearly thirty-eight years of service with the Baltimore City fire department and that they are, therefore, dissimilar to his workers' compensation benefits. While that may be true, in light of the unambiguous language of § 9–503(d)(2), it is also irrelevant.

We agree with the intermediate appellate court that the clear language of § 9–503(d)(2) negated the need to look elsewhere for its meaning. The section specifically and unambiguously requires that Polomski's workers' compensation benefits be reduced to the extent that, when combined with his retirement benefits, the sum does not exceed his weekly salary. If § 9–503(d)(2) is to be amended to require a setoff against only "similar benefits," that amendment must come from the General Assembly, not this Court. Polomski's workers' compensation benefits must accordingly be reduced.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  COSTS TO BE PAID BY PETITIONER.*