*Harford County, Maryland v. Gary E. Mitchell, Sr.*, No. 3456, September Term 2018. Opinion by Beachley, J.

**WORKERS' COMPENSATION—OFFSETS**

Appellee developed cardiovascular disease while working as a Deputy Sheriff for Harford County. He was awarded workers' compensation benefits in 2005. Ten years later, appellee retired and began receiving retirement benefits as well as workers' compensation benefits. Pursuant to Section 9-503(e)(2) of the Labor and Employment Article, workers' compensation benefits "shall be adjusted so that the weekly total of those benefits and retirement benefits does not exceed the weekly salary that was paid to" the public safety employee. The Workers' Compensation Commission calculated the offset to appellee's workers' compensation benefits based on his salary at retirement rather than his salary at the time of disablement from occupational disease.

The County appealed to the Circuit Court for Harford County, arguing that the offset should have been calculated based on appellee's average weekly wage when he first received workers' compensation benefits. The circuit court affirmed the Commission's decision, and the County appealed.

*Held*: Judgment affirmed. The offset in LE § 9-503(e)(2) is calculated based on the claimant's "weekly salary." "Average weekly wage" is a term of art defined by LE § 9-602, calculated based on the claimant's earnings at the time of injury or last injurious exposure to the hazards of an occupational disease. The Court concludes that the legislature's use of "weekly salary" rather than "average weekly wage" was intentional. Because the employee is generally entitled to receive both workers' compensation and retirement benefits, and construing the statute in accordance with its benevolent purpose, "weekly salary" refers to the claimant's salary at the time of retirement for purposes of calculating the offset.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 3456

September Term, 2018

_____

HARFORD COUNTY, MARYLAND

v.

GARY E. MITCHELL, SR.

_____

Nazarian,
Beachley,
Shaw Geter,

JJ.

_____

Opinion by Beachley, J.
_____

Filed: April 2, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

Public safety employees suffering from a work-related occupational disease are generally entitled to receive workers' compensation indemnity benefits in addition to any retirement benefits from a retirement plan the employee participated in at the time of the claim. That entitlement to receive both workers' compensation and retirement benefits is limited by an offset delineated in Section 9-503(e)(2) of the Labor and Employment Article, which provides that the workers' compensation benefits "shall be adjusted so that the weekly total of those benefits and retirement benefits does not exceed the weekly salary that was paid to" the public safety employee. Md. Code (1991, 2016 Repl. Vol., 2019 Supp.), § 9-503(e)(2) of the Labor and Employment Article ("LE"). We are called upon to answer a straightforward question of law: For purposes of calculating the offset, does the term "weekly salary" mean the public employee's weekly salary on the date of disablement resulting from an occupational disease or the employee's weekly salary at the time of retirement? Both the Workers' Compensation Commission and the Circuit Court for Harford County concluded that LE § 9-503(e)(2)'s offset provision contemplates using the employee's weekly salary at the time of retirement. We agree and shall therefore affirm.

## BACKGROUND

The parties do not dispute the relevant facts. Appellee Gary Mitchell worked as a Deputy Sheriff for appellant Harford County. After developing cardiovascular disease during his employment, Mitchell was awarded temporary total disability benefits on

October 14, 2005.  His average weekly wage at that time was $1,196.69.[1]

Upon Mitchell's retirement on July 1, 2015, he began receiving $790.48 per week in retirement benefits from a government sponsored pension plan.  On January 30, 2017, more than eighteen months after he retired, the Worker's Compensation Commission ("Commission") increased Mitchell's permanent partial disability award to $578.00 per week as a result of a worsening of his condition.  In determining the LE § 9-503 offset amount, the Commission concluded:

> Calculation of average weekly salary: The parties are to utilize the "weekly salary that was paid to the . . . police officer" which would be based on the weeks prior to retirement as opposed to the weeks used for average weekly wage which is determined by the weeks prior to the date of disablement.

(Alteration in original).  The Commission determined that Mitchell's weekly salary for the fourteen weeks prior to retirement was $1,721.00.[2]

The County appealed the Commission's decision to the Circuit Court for Harford County.  Both parties filed motions for summary judgment in the circuit court.  The circuit court granted summary judgment in favor of Mitchell, adopting the Commission's interpretation of the § 9-503 offset.  The County timely noted this appeal.

## DISCUSSION

The County argues that "weekly salary" in LE § 9-503(e)(2) is identical in meaning

---

[1] "Average weekly wage" is defined in LE § 9-602 and COMAR 14.09.03.06, and is usually calculated by finding the average of the claimant's wages for fourteen weeks of full-time employment prior to the injury or the last exposure to the hazards of an occupational disease.

[2] The Commission presumably used a fourteen-week period because that is the length of time used to determine average weekly wage.  LE § 9-602; COMAR 14.09.03.06.

to "average weekly wage," as defined in LE § 9-602.  In the County's view, because § 9-602 directs that the employee's average weekly wage shall be determined at the time of disablement, the Commission erred in using Mitchell's average weekly wage at retirement in calculating the offset.  The County argues that the Commission's interpretation of "weekly salary" conflicts with the legislative purpose of the offset provision to prevent duplicate benefits for a single wage loss.  According to the County, the Commission's interpretation does not serve to replace Mitchell's lost wages at the time of disablement in 2005, "but rather [his] higher salary at retirement."

Mitchell responds that the Commission's interpretation of the term "weekly salary" is consistent with the statute's legislative purpose.  He contends that, because the clear legislative intent of § 9-503(e)(2) is to ensure that a public safety employee's combined workers' compensation and retirement benefits do not exceed the employee's weekly salary, the term "'weekly salary' must mean a salary paid during the same time period as the payment of both workers' compensation benefits and retirement pension benefits." Mitchell finds significance in § 9-503(e)(2)'s use of "weekly salary" rather than the phrase "average weekly wage" found in § 9-602, asserting that the legislature recognized that "average weekly wage" was a term of art that permeates the Labor and Employment Article, yet chose not to use that phrase in § 9-503(e)(2).

The "paramount objective" when construing a statute "is to ascertain and give effect to the intent of the legislature." *Breitenbach v. N.B. Handy Co.*, 366 Md. 467, 472 (2001) (quoting *Philip Elecs. N. Am. v. Wright*, 348 Md. 209, 216 (1997)).  When interpreting the language of a statute, we seek to determine the intent of the legislature by looking first to

3

"the language of the statute itself." *Injured Workers' Ins. Fund v. Subsequent Injury Fund*, 447 Md. 211, 226 (2016) [hereinafter *IWIF*] (quoting *Schweitzer v. Brewer*, 280 Md. 430, 438 (1977)). "Generally, we give the words of the statute their 'ordinary and common meaning within the context in which they are used.'" *Mayor & City Council of Balt. v. Johnson*, 156 Md. App. 569, 592 (2004) (quoting *Polomski v. Mayor & City Council of Balt.*, 344 Md. 70, 75 (1996)). "Even in instances 'when the language is unambiguous, it is useful to review legislative history to confirm that interpretation and to eliminate another version of legislative intent alleged to be latent in the language.'" *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (quoting *State v. Roshchin*, 446 Md. 128, 140 (2016)). "[I]f the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end." *Breitenbach*, 366 Md. at 473.

If the language is ambiguous, we then consider the "objectives and purpose of the enactment." *Johnson*, 156 Md. App. at 592–93 (quoting *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 75 (1986)). To that end, "we read a statute so 'that no word, phrase, clause, or sentence is rendered surplusage or meaningless.'" *Id.* at 593 (quoting *Mazor v. State Dep't of Correction*, 279 Md. 355, 360 (1977)). We also may not "add or delete words" to give the statute "a meaning not reflected by the words the Legislature chose to use or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *IWIF*, 447 Md. at 226 (quoting *Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 302 (2001)). "Moreover, when the statute is part of a general statutory scheme or system, 'all sections must be read together . . . to discern the true intent of the

4

legislature.'" *Johnson*, 156 Md. App. at 593 (alteration in original) (quoting *Breitenbach*, 366 Md. at 472). In discerning the legislative intent, we seek to "avoid[] an illogical or unreasonable result, or one which is inconsistent with common sense." *Id.* (quoting *Chesapeake Charter, Inc. v. Anne Arundel Cty. Bd. of Educ.*, 358 Md. 129, 135 (2000)). "Last, applying a canon of construction specific to the Act, if the intent of the legislature is ambiguous or remains unclear, we resolve any uncertainty in favor of the claimant." *Breitenbach*, 366 Md. at 473.

The relevant portion of the Workers' Compensation Act at issue here reads:

(e)(1) Except as provided in paragraph (2) of this subsection, any . . . paid police officer . . . who is eligible for benefits under subsection (a), (b), (c), or (d) of this section or the dependents of those individuals shall receive the benefits in addition to any benefits that the individual or the dependents of the individual are entitled to receive under the retirement system in which the individual was a participant at the time of the claim.

(2) *The benefits received under this title shall be adjusted so that the weekly total of those benefits and retirement benefits does not exceed the weekly salary that was paid to the . . . police officer.*

LE § 9-503 (emphasis added). The basic purpose of the statute is clear, as recognized by the Court of Appeals in *Balt. Cty. v. Thiergartner*:

A provision of the workers' compensation law creates a presumption favorable to certain categories of public safety employees. In particular, the law presumes that certain disabling medical conditions, such as heart disease, hypertension, and lung disease, are occupational diseases suffered in the line of duty and are therefore compensable under the workers' compensation law. However, the statute caps those benefits: the sum of workers' compensation benefits and a retired employee's retirement benefits may not exceed the employee's average weekly salary during employment. The formula for capping workers' compensation benefits, seemingly simple in its description, inevitably raises questions in its implementation, particularly when its components take different forms paid on different timetables.

5

442 Md. 518, 519 (2015). Thus, while the essential legislative purpose is obvious, its "implementation" is not so clear. This case presents the type of implementation difficulty that the *Thiergartner* Court presciently foresaw.

LE § 9-503(e)(1) provides that a public safety employee shall receive workers' compensation benefits pursuant to the occupational disease presumption of LE § 9-503 "in addition to any benefits that the individual [is] entitled to receive under the retirement system in which the individual was a participant at the time of the claim." Thus, the employee is generally entitled to receive both workers' compensation and retirement benefits. But § 9-503(e)(2) expressly provides that the total of workers' compensation and retirement benefits may not "exceed the weekly salary that was paid to" the public safety employee. Notably, though subsection (1) specifies that the employee must have been a participant in the retirement system "at the time of the claim[,]" the offset provision in subsection (2) provides no indication whether the term "weekly salary" means the employee's weekly salary at the time of his workers' compensation claim or his weekly salary when he retired. This ambiguity requires us to engage the canons of statutory construction.

Because of the statutory ambiguity, we consider the legislative purpose for the statute. *Johnson*, 156 Md. App. at 592–93. The purpose of the Workers' Compensation Act generally is to "provide employees with compensation for loss of earning capacity, regardless of fault, resulting from accidental injury [or occupational disease] occurring in the course of employment." *Johnson v. Mayor & City Council of Balt.*, 203 Md. App. 673, 684 (2012) (quoting *Doe v. Buccini Pollin Grp., Inc.*, 201 Md. App. 409, 420 (2011)). The

6

presumption of compensability in LE § 9-503 resulted from the recognition that firefighters, police officers, and other public safety employees are susceptible to occupational diseases that the Act did not recognize as occupational at the time the predecessor to LE § 9-503 was enacted. *Polomski*, 344 Md. at 78. The offset in LE § 9-503(e) is more generous than the offset for other public employees, but nevertheless serves to protect the public coffers, a balance that "protects both the government employee whose weekly wage is maintained, and the public treasury that is not required to pay duplicate benefits for a single wage loss." *Mayor & City Council of Balt. v. Polomski*, 106 Md. App. 689, 698 (1995). "[T]he unmistakable intent of the Legislature since 1914 has been to provide only a single recovery for governmental employees covered by both a pension plan and workers' compensation." *Id.* at 697–98 (citing *Frank v. Balt. Cty.*, 284 Md. 655 (1979)). Keeping this legislative purpose in mind, we turn now to other recognized tools for statutory interpretation.

The legislative history of the statute sheds no light on the legislative intent. The original version of the statute, Art. 101, § 64A, was "added to the workers' compensation law in 1971 prior to the time when the General Assembly retained legislative background materials pertaining to individual bills." *Thiergartner*, 442 Md. at 530 n.8. The difference in wording between Art 101, § 64A and its recodification as the current LE § 9-503(e)(2) is negligible. The relevant portion of § 64A read: "The benefits received under this article however, shall be adjusted so that the total of all weekly benefits shall not exceed one hundred percent of the weekly salary which was paid to" the employee. *Polomski*, 344 Md. at 78–79. LE § 9-503(e)(2) currently provides: "The benefits received under this title

7

shall be adjusted so that the weekly total of those benefits and retirement benefits does not exceed the weekly salary that was paid to" the employee. In *Thiergartner*, the Court of Appeals stated in a footnote:

> When the offset formula was recodified in 1991 as part of the new Labor & Employment Article, the code revisors noted, for consideration by the General Assembly that the statute did not specify the period of time that should be used for determining the "weekly salary" of the individual. The General Assembly has not yet responded to the revisors' suggestion.

*Thiergartner*, 442 Md. at 525 n.4 (citation omitted). The General Assembly has still not responded to the code revisors' suggestion.

In our quest to unearth legislative intent, *Injured Workers' Insurance Fund* provides some guidance. That case involved the 6.5% statutory assessment imposed on employers and insurers and payable to the Subsequent Injury Fund (SIF).

The statute under consideration there, LE § 9-806, provided in pertinent part:

(a)(1) The Commission shall impose an assessment of 6.5%, payable to the Subsequent Injury Fund, on:

> (i) *each award against an employer or its insurer for permanent disability or death*, including awards for disfigurement and mutilation;

> (ii) except as provided in paragraph (2) of this subsection, *each amount payable by an employer or its insurer under a settlement agreement* approved by the Commission; and

> (iii) each amount payable under item (i) or (ii) of this paragraph by the Property and Casualty Guaranty Corporation on behalf of an insolvent insurer.

(Emphasis added).

In two consolidated appeals, the respective employers argued that "award" in subsection (i) should be construed to require the employers to pay the 6.5% SIF assessment

8

based on the amount payable to the claimants *after* the statutory offsets. *IWIF*, 447 Md. at 222–23. The Court rejected this interpretation because the employers did not consider the word in the context of the rest of the statute, stating that the employers' definition "ignores the fact that LE § 9-806(a)(1)(i) specifically states that [the assessment] applies to 'each award . . . for permanent disability or death' rather than the term 'award' in the abstract." *Id.* at 227 (second alteration in original). Within the context of the surrounding statutory language, the Court concluded that "the 'award' itself is based on the claimant's 'permanent disability,' which does not change simply because the employer is entitled to an offset for some other reason." *Id.* (quoting *Injured Workers' Ins. Fund v. Subsequent Injury Fund*, 222 Md. App. 347, 356 (2015)). The Court further noted that, while the statute used the words "award . . . for permanent disability or death" in subsection (i), in subsection (ii) it used "amount payable . . . under a settlement agreement." *Id.* at 227. The Court found this difference significant:

> The General Assembly chose to use different language to impose the [Subsequent Injury Fund] assessment on awards for permanent disability or death as compared to settlement agreements. This evidences the clear intent of the General Assembly to have the 6.5% assessment applied to the entire award for permanent disability or death rather than the amount payable after deductions are made for offsets.

*Id.* at 228. Finally, the Court concluded that interpreting "award" to mean the amount of the award prior to the offset was in keeping with the purpose of the statutory scheme. *Id.* at 228–29. Doing so "does not place a double burden on the public employer . . . because the employer or its insurer pays no more to [the] SIF than it would have paid had the

9

employee not received any offsetting disability retirement benefits." *Id.* at 229 (alterations in original) (quoting *Injured Workers' Ins. Fund*, 222 Md. App. at 358).

Important to our analysis is the principle that when "two statutes say different things, they mean different things." *Polomski*, 344 Md. at 82. Just as "award" and "amount payable" mean different things when used in different parts of the same statutory scheme, *IWIF*, 447 Md. 211, we discern a distinct legislative intent from the use of "weekly salary" in LE § 9-503 rather than "average weekly wage." "Average weekly wage" is a term of art, carefully defined in LE § 9-602.[3] A claimant's average weekly wage is set "at the time of: 1. the accidental personal injury; or 2. the last injurious exposure of the covered employee to the hazards of an occupational disease." LE § 9-602(a)(1)(ii). The average weekly wage does not change as a result of a salary increase that occurs after the injury or exposure. *Jung v. Southland Corp.*, 351 Md. 165, 177 (1998). The General Assembly's decision to use "weekly salary" instead of "average weekly wage" in LE § 9-503 evidences its intent to separate and distinguish LE § 9-503 from LE § 9-602, signaling to litigants and courts that the § 9-503(e)(2) offset was not linked to the claimant's earnings at the time of the occupational exposure.

The only other potential time period for calculating the LE § 9-503 offset is the time of the claimant's retirement. Accordingly, we conclude that the legislature intended

---

[3] The Worker's Compensation Act relies upon the LE § 9-602 definition of "average weekly wage" in fourteen separate sections, including in LE §§ 9-232.1 (describing which wages shall be used to determine the average weekly wage of a civil defense volunteer), 9-615 (calculation of payment for temporary partial disability), 9-626 (determining minimum compensation for permanent partial disability for employee with average weekly wage of less than $50), and 9-681 (calculating death benefits payable to dependents).

"weekly salary" to mean the claimant's earnings at the time of retirement. That conclusion is consistent with the statute's benevolent purposes for injured workers. *See Gang v. Montgomery Cty.*, 464 Md. 270, 279 (2019) ("The Act is remedial in nature and 'should be construed as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes.'" (quoting *Stachowski v. Sysco Food Servs. of Balt., Inc.*, 402 Md. 506, 513 (2007))). We note that the statutory offset is only applicable when the employee is receiving both workers' compensation and retirement benefits. Accordingly, using the employee's weekly salary at retirement will likely maximize his total benefits, thereby promoting the benevolent purpose of the statute.

Contrary to the County's assertions, interpreting "weekly salary" to refer to the period immediately before retirement will not result in multiple compensations for a single wage loss. Mitchell lost a single weekly wage—the $1,721.00 he was receiving before retirement. Under our interpretation of the statute, Mitchell will receive his $790.48 weekly retirement benefit plus $578.00 per week in workers' compensation benefits, for a total of $1,368.48 per week. Thus, Mitchell will receive $352.52 less per week than his weekly salary at retirement. We fail to see how this interpretation requires the County to pay duplicate benefits.

Our interpretation of the statutory offset brings this case in line with the common situation where the employee develops an occupational disease after retiring. The County cites to *IWIF*, 447 Md. 211; *Thiergartner*, 442 Md. 518; *Johnson*, 156 Md. App. 569; and *Harris v. Mayor & City Council of Balt.*, 66 Md. App. 397 (1986), to argue that those cases assumed that "weekly salary" means "average weekly wage." However, in all of the cited

11

cases, the claimants began receiving retirement or death benefits either prior to or concurrently with their date of disablement. The last time period in which those claimants were paid any weekly salary or wage was immediately prior to retirement or death. Thus, there was no controversy in those cases whether "weekly salary" meant something different from "average weekly wage" because all parties agreed that the period prior to retirement or death should be used to calculate the offset. *Thiergartner* was the only case that mentioned the potential ambiguity in determining "weekly salary," and the Court explicitly did not address the issue because it was not in dispute. *Thiergartner*, 442 Md. at 525 n.4. Under our interpretation of the statute, it will make no difference whether the public safety employee suffers an occupational disease before or after his retirement—the "weekly salary" at the time of retirement shall be used to calculate the § 9-503(e)(2) offset in all cases, thereby providing consistency in calculating the offset and eliminating any confusion that may arise in determining the claimant's "average weekly wage" at the time of his occupational disablement.

We conclude that the legislature intended "weekly salary" in LE § 9-503(e)(2) to mean the claimant's salary immediately prior to retirement. We therefore affirm the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

12