699 A.2d 531

**GALLAUDET UNIVERSITY**

v.

**The NATIONAL SOCIETY OF THE DAUGHTERS OF THE AMERICAN REVOLUTION, et al.**

**No. 1733, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Sept. 4, 1997.

172

174

Scott T. Kragie (Stephanie A. Goldfine and Squire, Sanders & Dempsey, on the brief), Washington, DC, for Appellant.

Christine N. Kearns (Michelle M. Huhnke and Shaw, Pittman, Potts & Trowbridge, on the brief), Washington, DC, for Appellees.

Argued before HARRELL, SALMON and THIEME, JJ.

HARRELL, Judge.

Gallaudet University (Gallaudet) appeals from a judgment of the Circuit Court for Baltimore County in which the court, employing the equitable doctrine of *cy pres* as conferred upon it by the legislature in Md.Code (1974, 1991 Repl.Vol., 1996 Supp.) Est. & Trusts § 14–302, saved an ineffective bequest to charity and awarded The National Society of the Daughters of the American Revolution (the DAR) a portion of the residuary estate of Mrs. Olive Swindells. Appellant contends that (1) the circuit court should have applied Md.Code, Est. & Trusts § 4–404, rather than *cy pres*, to determine the proper devolution of the ineffective charitable bequest, and alternatively, (2) the testator did not manifest a general charitable intent, thereby eliminating a pre-requisite for the application of the *cy pres* doctrine. Because we conclude that the trial court applied an incorrect analytical framework in determining whether the testator manifested a general charitable intent, we shall reverse the judgment of the circuit court and remand

this case for further proceedings not inconsistent with this opinion.

## ISSUES

This case presents the following issues, condensed and rephrased by us as:

I. Whether an ineffective charitable bequest can be saved by Maryland's *Cy Pres* Statute rather than being devolved according to other rules regarding lapsed or void legacies.

II. Whether the trial court erred in concluding that Mrs. Swindells manifested a general charitable intent.

III. Whether the trial court, in framing an alternate scheme of distribution for the ineffective bequest, abused its discretion by distributing the proceeds of that bequest to the DAR.

## FACTS [1]

This case involves a dispute over the proper devolution of an ineffective charitable bequest contained in the Last Will and Testament executed by Olive Swindells. Mrs. Swindells suffered from a severe hearing impairment and was legally deaf in her later years. Bertram Swindells, her husband, had been profoundly deaf since early childhood. The Swindells had no family.

On or about 25 October 1994, Mrs. Swindells engaged the services of Bruce E. Goodman, Esquire, of Baltimore to assist her in the preparation of a will. Mrs. Swindells instructed Mr. Goodman to prepare a will that would establish a trust to provide for the care of her husband, if she predeceased him, and contain a residuary clause leaving 80% of her estate to Gallaudet and 20% to the DAR Nursing Home for the benefit of destitute members of the DAR who could not afford nursing

---

1. Our recitation of the facts underlying the instant dispute is derived almost entirely from an Agreed Statement of Undisputed Facts submitted by the parties pursuant to Rule 8–501(g). Counsel are to be complimented for this and how the case has been brought forth generally.

home care. Mrs. Swindells, however, was unable to furnish Mr. Goodman with the DAR Nursing Home's location. Despite her advanced age—she was 94 years old at the time—Mr. Goodman concluded that Mrs. Swindells was competent and able to understand the importance and significance of a will executed with the requisite formalities.

Sometime in late October 1994, Mr. Goodman drafted the Last Will and Testament of Olive Swindells that devised the residuary estate as follows:

1. 80% to Gallaudet College.
2. 20% to the (DAR) Daughters of the American Revolution Nursing Home for the use of destitute members of the (DAR) Daughters of the American Revolution.

On 2 November 1994, Mrs. Swindells executed this will.[2]

The American Society of the Daughters of the American Revolution (the DAR) is a service organization founded in 1890 whose objective is to "perpetuate the memory and spirit of the men and women who achieved American Independence; to develop and enlighten public opinion; and, to foster true patriotism and love of country." The DAR has engaged in a variety of historical, educational, and charitable functions since its inception. DAR members perform volunteer service in several medical centers and nursing homes certified by the Veterans Administration. Although some of the DAR's philanthropic activities may indirectly benefit elderly, deaf, or hard-of-hearing persons, the DAR does not operate any programs specifically for that constituency. As of the date Mrs. Swindells executed her will, the DAR had never administered a specific program for the study or care of solely the elderly.

Mrs. Swindells had had a lengthy on-again, off-again relationship with the DAR. On 11 December 1925, she was admitted to the DAR as a member-at-large. Approximately three years later she was dropped from the DAR's membership rolls on account of non-payment of dues. During the 1950's she

---

2. While executing the will, Mrs. Swindells made one change by interlineation that is not relevant to the disposition of this appeal.

rekindled her affiliation with the DAR and became a member of their Baltimore Chapter. In 1958 she resigned. Ten years later, she became an organizing member of the DAR's Big Cypress Chapter in Naples, Florida, and served as that chapter's recording secretary. In 1984, she specifically requested to be designated an honorary member of the DAR. In recognition of her long relationship with the DAR, the Big Cypress chapter, in 1986, conferred a "unique honor" upon Mrs. Swindells by paying her membership dues for life. Mrs. Swindells attended meetings of the Big Cypress Chapter though 1984, and remained a member of the society until her death in 1995.

Gallaudet University (Gallaudet) has been in continuous operation since 1857. Prior to 1954, Gallaudet was known as the Columbia Institution for the Deaf, Dumb, and Blind. It was renamed Gallaudet College in 1954 and obtained university status in 1986. Gallaudet is a private, non-profit corporation dedicated to furnishing educational and related services to hearing-impaired individuals of all ages, and to their families and care-givers. Gallaudet also provides a wide array of services specifically for the benefit of hearing impaired senior citizens. Neither Mr. or Mrs. Swindells ever attended or had any formal affiliation with Gallaudet.

By letter dated 28 October 1994, Mr. Goodman notified the Maryland Chapter of the DAR (MD–DAR) that Mrs. Swindells wished to "leave a bequest to the DAR Nursing Home facility that cares for indigent members of the DAR." Mr. Goodman received a written reply from the MD–DAR on or about 15 December 1994, which stated in relevant part:

The Maryland State Society regrets that as far as we have ascertained, there is not a DAR Nursing Home facility. We would appreciate any knowledge your client has on this facility.

Suggestions have been made:

1. Client could create a trust fund in her name, the interest from which would be paid for preservation of the Maryland State Chapter House.

2. Client could create a fund for a scholarship of her choice such as medical [sic.].

3. The National Society, DAR owns a complex of Historic Buildings ... in Washington, DC. The renovations and preservation of this complex is a constant project and is of great importance to all DAR members.

Only this week have had [sic.] another request for a DAR Nursing home. It would certainly be a goal for the future.

Soon thereafter, Mr. Goodman telephoned Mrs. Swindells and read verbatim the MD–DAR letter to her. Mrs. Swindells responded to the news that the nursing home did not exist by informing Mr. Goodman that she wished to leave her entire residuary estate to Gallaudet, and directed him to prepare a new will accordingly. Mr. Goodman prepared a revised will that provided for a trust for Mr. Swindells and named Gallaudet as the sole residuary legatee. This revised will omitted any reference to the DAR. By 27 December 1994, Mrs. Swindells had not yet executed the revised will.

Bertram Swindells died on 27 December 1994. Thereafter, Mrs. Swindells instructed Mr. Goodman to revise her will once again to delete the trust for Mr. Swindells. She also requested that a limiting clause be inserted into the will so as require that her bequest to Gallaudet be utilized only for scholarships. She also said that she did not want the money from the gift used for constructing a building. Consequently, Mr. Goodman prepared a further revised will, which stated in relevant part:

ITEM II: I hereby give, devise and bequeath, all of the rest residue and remainder of my Estate to Gallaudet College, an educational institution now located in Washington, D.C. This gift may, in the discretion of the Board of Trustee maybe [sic.] merged and mingled with and become a part of the general investment assets of said College, and shall be known as the BERTRAM L. SWINDELLS AND OLIVE R. SWINDELLS Scholarship Fund, and the income, but not the principal, thereof shall be used to establish a Scholarship or Scholarships and the selection of the beneficiaries thereof shall be determined by the President or such other

authority as may be designated by the said Board of Trustees for said purpose.

After drafting the revised residuary clause, Mr. Goodman telephoned Mrs. Swindells to inform her that she needed to execute the new will and attempted to schedule an appointment with her. Mrs. Swindells told him she would not be able to schedule that appointment for some time because she was busy preparing to take her driver's license renewal test and was also attending to matters arising out of the death of her husband. She told Mr. Goodman that once things settled down, she would schedule the appointment. That was the last time Mr. Goodman communicated with Mrs. Swindells. Olive Swindells died on 16 March 1995, at the age of 94, without executing any will other than the will of 2 November 1994. Mrs. Swindells's estate included a portfolio of stocks and bonds with a fair market value in excess of $4 million as of the date of her death.

By letter dated 19 June 1995, Mr. Goodman informed the DAR that if there was no DAR Nursing Home, he would petition for distribution of the entire estate to Gallaudet. Counsel for the DAR ultimately responded and advised Mr. Goodman that the DAR would assert a claim of 20% of the residuary estate under the doctrine of *cy pres.* Because Gallaudet and the DAR could not reach an agreement, on 14 December 1995 Mr. Goodman filed a petition for a meeting of distributees with the Orphans Court of Baltimore County.[3] The Orphans Court conducted a meeting of the claimants on 27 February 1996 and issued a ruling on 29 February 1996 that stated in pertinent part:

[T]he Court is satisfied that her intention to bequeath twenty percent (20%) of her residuary estate to the Daughters of the American Revolution Nursing Home for the use of the destitute members of the Daughters of the American Revolution is Upheld.

---

3. Because there was no dispute as to 80% of the residual estate, Mr. Goodman made a partial distribution of $3 million to Gallaudet.

Therefore, pursuant to the provisions of the Estates and Trusts Article, Section 9–112(e), Bruce E. Goodman, personal Representative of the Estate of Olive Swindells is directed to make distribution of the aforesaid twenty percent (20%) of the residuary estate to the Daughters of the American Revolution for use in a manner as close as possible to the original intent of the testatrix. . . .

Gallaudet appealed this decision to the Circuit Court for Baltimore County and a bench trial was conducted on 3 September 1996. At that time, the DAR stipulated to Gallaudet's "Statement of Material Facts as to Which there is No Genuine Issue," with only minor modifications. The amended statement of facts, supporting documents, and additional stipulations proposed by the DAR were admitted into evidence. Mr. Goodman testified. At the trial's conclusion, the circuit court held that the Void Legacy Statute, Md.Code, Est. & Trusts § 4–404(b)[4] was inapplicable to void charitable bequests, and that the void legacy should be distributed under the *cy pres* statute, ET 14–302. The court then concluded that the "general charitable intent" necessary to invoke the doctrine of *cy pres* was present. Finally, the chancellor applied his equitable power to "excise the words 'nursing home' from the bequest" and construe the will as if it "read 20 percent to the Daughters of the American Revolution for the use of destitute members. . . ." Gallaudet filed a timely Notice of Appeal, and the circuit court stayed enforcement of its judgment pending appeal.

## ANALYSIS

### I.

Appellant's first contention is that Maryland's Void Legacy Statute, rather than the *Cy Pres* Statute, governed the devolution of the ineffective bequest to the DAR Nursing Home. If so, the ineffective bequest would have accrued to the residuary

---

4. Throughout the balance of this opinion we shall refer to the Estates and Trusts Article of the Code of Maryland as ET —— — ——.

legatee, Gallaudet. Appellant takes issue with the circuit court's conclusion that the Void Legacy Statute should apply only to non-charitable bequests.

In issuing its oral ruling at the close of the 3 September 1996 hearing, the circuit court stated:

[I]t would appear to the Court that [the Void Legacy Statute] should apply in cases of noncharitable bequests....

\* \* \*

This matter involves a charitable bequest, and therefore the Court finds that it should be interpreted under [the *Cy Pres* statute]. It would seem to me that the general assembly wished to have charitable bequests interpreted under this statute and for good reason. When a person wishes to in some way enrich a charity, oftentimes the charity itself is not to be the direct recipient of the testator's largess; and I believe that's the case in this case. In this situation, the charity is merely the mechanism by which the testator's estate is bestowed upon the class of persons whom the testator wishes to enrich.

The Void Legacy Statute, ET 4–404, reads:

**§ 4–404. Void or inoperative legacies.**

(a) *Nonresiduary legatee.*—Unless a contrary intent is expressly indicated in the will, property failing to pass under a void or inoperative legacy, and which is not provided for in § 4–403, shall be distributed as part of the estate of the testator to those persons, including legatees, who would have taken the property if the void or inoperative legacy had not existed.

(b) *Residuary legatee.*—Where a legacy to one of two or more residuary legatees is void or inoperative, the other residuary legacies shall be augmented proportionately by the property which is the subject of the legacy.

Gallaudet claims that, based on the plain wording of the statute, there is no indication that its applicability was limited to non-charitable bequests only. Rather, Gallaudet maintains

that ET 4–404 should apply to all void or inoperative legacies that fall within its terms.

Gallaudet also posits that the *Cy Pres* Statute does not amend or limit the Void Legacy Statute. The *Cy Pres* Statute reads, in pertinent part:

> § 14–302. **Uniform Charitable Trusts Administration Act.**
>
> (a) *General Rule.*—If a trust for charity is or becomes illegal, or impossible or impracticable of enforcement or if a devise or bequest for charity, at the time it was intended to become effective, is illegal, or impossible or impracticable of enforcement, and if the settlor or testator manifested a general intention to devote the property to charity, a court of equity, on application of . . . any interested person, . . . may order an administration of the trust, devise or bequest as nearly as possible to fulfill the general charitable intention of the settlor or testator.

Gallaudet also argues that the mandatory provisions of the Void Legacy Statute should control over the discretionary provision contained in the *Cy Pres* Statute. Finally, appellant contends that because the Void Legacy Statute is the more specific of the two, and because it was the more recently enacted provision, it should control.

■ While we agree with the trial court's ultimate conclusion that the proper devolution of the ineffective bequest to the DAR Nursing Home should have been analyzed under the *Cy Pres* Statute, the circuit court's reasoning requires some refinement which we shall furnish below. In our view, the trial judge erred in declaring that the Void Legacy Statute should apply in cases of noncharitable bequests. One reasonable—and erroneous—inference that can be drawn from this statement is that the Void Legacy Statute never applies to charitable bequests. We conclude that the applicability of ET 4–404, the Void Legacy Statute, and its partner in the war against intestacy, ET 4–403, the Anti–Lapse Statute, are limited to those situations when there is not another rule addressing the proper devolution of a particular bequest.

Stated differently, the function of the Anti–Lapse Statute and the Void Legacy Statute is similar to that of a grease trap—together they serve to prevent ineffective bequests or devises that have not already been filtered out by another rule of property disposition from seeping into the pit of intestacy. In short, ET 4–403 and ET 4–404 serve as a last line of defense, rather than as a preemptive strike, against intestacy. We explain.

Our analysis begins by noting that our prime directive when construing a statute is to ascertain and effectuate the intention or purpose of the legislature. *Polomski v. Mayor & City Council of Baltimore,* 344 Md. 70, 684 A.2d 1338 (1996). *See State v. Bricker,* 321 Md. 86, 581 A.2d 9 (1990); *Cox v. Prince George's County,* 86 Md.App. 179, 586 A.2d 43 (1991). The primary source for determining such intent is the statute itself. *Klingenberg v. Klingenberg,* 342 Md. 315, 675 A.2d 551 (1996); *McNeil v. State,* 112 Md.App. 434, 685 A.2d 839 (1996). If the language of a statute is plain and unambiguous, no further analysis of legislative intent is ordinarily required. *Board of Trustees of Md. State Retirement & Pension Sys. v. Hughes,* 340 Md. 1, 7, 664 A.2d 1250 (1995); *Rose v. Fox Pool Corp.,* 335 Md. 351, 643 A.2d 906 (1994). It is only in cases that the will of the legislature is not readily apparent from the language of a statute that a court may resort to the cannons of statutory construction. *Polomski, supra.*

Although appellant is correct in asserting that the court determines legislative intent primarily by reference to the plain language of the statute, appellant fails to acknowledge a parallel principle of statutory construction—a court cannot view the statute in isolation. Rather, in construing a statute, we must examine the entire statutory scheme, *Morris v. Osmose Wood Preserving,* 340 Md. 519, 667 A.2d 624 (1995), by considering the interrelationship or connection among all of the statute's provisions, *Coburn v. Coburn,* 342 Md. 244, 674 A.2d 951 (1996); *Jones v. State,* 311 Md. 398, 535 A.2d 471

(1988), even when the precise statute under scrutiny is not ambiguously worded.

Turning our attention to the substantive law regarding wills, we note that there are few limitations placed upon a testator's right to dispose of his or her own property as he or she pleases. Instead, most of the disputes that arise out of the submission of a will to probate are due to the testator's inadequate expression of his or her wishes. Contained within the Rules Relating to Legacies, ET 4–401, *et seq.*, are a series of rules designed to assist a court in construing a will when a testator fails to provide for a contingency that occurs prior to his or her death.

Just as nature is said to abhor a vacuum, Maryland courts in addressing these disputes have long abhorred intestacy when an individual sits down to dispose of the rest and residue of his or her estate under a will. *See Payne v. Payne,* 136 Md. 551, 555, 111 A. 81 (1920); *Davis v. Hilliard,* 129 Md. 348, 357–58, 99 A. 420 (1916); *Gilman v. Porter,* 126 Md. 636, 641, 95 A. 660 (1915); *Holmes v. Mackenzie,* 118 Md. 210, 215, 84 A. 340 (1912); *Lewis v. Payne,* 113 Md. 127, 137, 77 A. 321 (1910); *Lavender v. Rosenheim,* 110 Md. 150, 153, 72 A. 669 (1909); *Fisher v. Wagner,* 109 Md. 243, 258, 71 A. 999 (1909); *Reid v. Walbach,* 75 Md. 205, 217, 23 A. 472 (1892); *Dulany v. Middleton,* 72 Md. 67, 76, 19 A. 146 (1890); *Murray v. Willett,* 36 Md.App. 551, 554, 373 A.2d 1303 (1977). "A fundamental ingrained principle of the testamentary law of Maryland is that when a will contains a residuary clause, the courts will employ every intendment against general or partial intestacy." *Murray v. Willett,* 36 Md.App. at 552, 373 A.2d 1303 (Gilbert, C.J.).[5] *Accord Wesley Home, Inc. v. Mercantile–Safe Deposit & Trust Co.,* 265 Md. 185, 289 A.2d 337; *Gosnell v. Leibman,* 162 Md. 542, 544, 160 A. 277 (1932) *Albert v. Safe Deposit &*

---

**5.** *See also* 2 Blackstone, *Commentaries on the Laws of England* 514 (Lewis ed. 1902) ("When all the debts and particular legacies are discharged, the surplus, or residuum, must be paid to the residuary legatee, if any be appointed by the will; and if there be none, it was long a settled notion that it devolved to the executor's own use, by virtue of his executorship."), *quoted in Murray v. Willett, supra.*

*Trust Co.,* 132 Md. 104, 109, 103 A. 130 (1918); *Lyon v. Safe Deposit & Trust Co.,* 120 Md. 514, 525, 87 A. 1089 (1913); *Welsh v. Gist,* 101 Md. 606, 608, 61 A. 665 (1905); *Johnson v. Safe Deposit & Trust Co.,* 79 Md. 18, 21, 28 A. 890 (1894); *Tayloe v. Mosher,* 29 Md. 443, 451 (1868); *Lowenthal v. Rome,* 57 Md.App. 728, 471 A.2d 1102 (1984). ET 4–402 assists in preventing intestacy by creating a statutory presumption that a will, if properly executed, passes all property the testator owns at the time of his or her death.

At common law, if a devisee or legatee predeceased the testator, absent a clause in the will providing for an alternate disposition of the gift, the devise lapsed. *See Bartlett v. Ligon,* 135 Md. 620, 623–24, 109 A. 473, 475 (1920). Maryland's first anti-lapse statute, contained in the Acts of 1810, ch. 14, § 4, reversed the common law, and provided that a bequest to a legatee who predeceased the testator would not lapse or fail.[6] Rather, such devises would transfer to the heirs of the deceased legatee as if the legatee had died intestate. Since then, the statute has undergone several amendments but has essentially retained its original effect.[7] In its current iteration, the Anti–Lapse Statute provides: Unless a will states otherwise, if a legatee does not survive the testator, the legacy is saved from lapsing and, at the testator's death, passes to those persons then living who would have been entitled to take as distributees of the legatee, had he survived

---

6. The act read as follows: "No devise, legacy or bequest, shall lapse or fail of taking effect by reason of the death of any devisee or legatee named in any last will or testament or any codicil thereto, in the lifetime of the testator; but every such devise, legacy or bequest, shall have the same effect and operation in law to transfer the right, estate and interest in the property mentioned in such devise or bequest, as if such devisee or legatee had survived the testator," *quoted in Young v. Robinson,* 11 G. & J. 328, 332 (Md.1840).

7. For a more complete history of the Anti–Lapse Statute see Miller, *Construction of Wills* 151–52 (1927); Mullen, *The Maryland Statute Relating to Lapsing of Testamentary Gifts,* 7 Md. L.Rev. 101, 105–06 (1943); 1 Sykes, *Maryland Probate Law and Practice* 131–32 (1956); Northrop & Schmul, *Decedents' Estates in Maryland* § 4–6(d) (1994).

the testator and dies, testate or intestate, owning the property.

It did not take long for the Court of Appeals to recognize that the sole object of the Anti–Lapse Statute was to prevent the lapsing of devises and bequests. *Glenn v. Belt,* 7 G. & J. 362, 366 (Md.1835). Consistent with this purpose, the Court also recognized that, when the devise or bequest would not have lapsed, the statute was inapplicable. In *Craycroft v. Craycroft,* 6 H. & J. 54 (Md.1823), a testator devised real property to his three sons as joint tenants, one of whom predeceased the testator. In holding that the Anti–Lapse Statute was inapplicable to those facts, the Court reasoned:

The Legislature only intended to make provision for a case, which before was not provided for by law, by giving life and effect to a devise or bequest which otherwise would be inoperative, and not to give to an operative devise or bequest an effect different from that which the law before gave, and thus to change the legal course of the property, and to give it a new direction.... [T]hat would be to strain the Act rather too far, in order to apply it to a case not within the mischief intended to be remedied, not to preserve, and give life and effect to a devise or bequest, that would otherwise be extinguished, but to divest a subsisting and operative devise or bequest of its legal character and effect which was not the object of the law. It is only intended to prevent the extinguishment of a devise or bequest, by reasons of the death of the devisee or legatee in the lifetime of the testator, when, in the event of such death, the devise or bequest would, without the aid of the Legislature, have lapsed, or failed to take effect, and the deceased have died intestate in relation to the property therein mentioned.... Therefore, where the devise or bequest would not have lapsed or failed to take effect by reason of the death of a devisee or legatee in the lifetime of the testator, as in this case, it is not within the mischief intended, or required to be remedied, and the Act of Assembly does not apply, but such devise or bequest is left to its own operation in law.

*Id.*, at 56–57. As subsequently recognized by the Court, the Anti-Lapse Statute was inapplicable because *Craycroft* did not involve a lapsed devise. *Vogel v. Turnt,* 110 Md. 192, 198, 72 A. 661, 663 (1909). Subsequent decisions have reaffirmed the finite limits of the Anti–Lapse Statute's reach. *Stahl v. Emery,* 147 Md. 123, 133, 127 A. 760 (1925) (statute does not apply to a gift to a class of persons or to survivors); *Mercer v. Hopkins,* 88 Md. 292, 314, 41 A. 156 (1898) (statute does not apply when legacy or devise is of life estate); *Young v. Robinson,* 11 G. & J. 328, 329, 341–43 (Md.1840) (gift to fluctuating class of persons who are to be ascertained at the death of the testator); *Helms v. Franciscus,* 2 Bland 544 (Md.Ch.1830) (legacy charged upon real estate and legatee dies after death of testator but before time of payment). In sum, the Court has recognized from the outset that, by enacting the Anti–Lapse Statute, it was not the intent of the legislature to change or alter any of the existing rules concerning the devolution of property. *See Stahl,* 147 Md. at 133, 127 A. 760; *Young v. Robinson,* 11 G. & J. at 341–42. The statute merely made a provision for a scenario that before had not been addressed by law, by giving effect to a devise or bequest that otherwise would have fallen into intestacy.

In the case at bar, the statute under scrutiny is the Void Legacy Statute, ET 4–404. By statute, and at common law, a distinction had been drawn between lapsed and void legacies. In *Billingsley v. Tongue,* 9 Md. 575, 581–82 (1856), the Court noted: "In the former case the devisee dies in the intermediate time between the making of the will and the death of the testator; in the latter case the devise is void at the beginning, as if the devisee be dead when the will was made." *See also Rizer v. Perry,* 58 Md. 112, 135 (1882); *Tongue's Lessee v. Nutwell,* 13 Md. 415, 427–28 (1859); *Trippe v. Frazier,* 4 H. & J. 446, 447 (Md.1819). Void legacies were not saved by the Anti–Lapse Statute. *Vogel,* 110 Md. at 198–99, 72 A. 661 (citing *Billingsley,* 9 Md. at 581–82).

At common law, when a testamentary gift was void, the devolution of that property was determined by its character as personal or real, and if personal, by the presence of a residu-

ary clause. Prior to the enactment of the Void Legacy Statute, void bequests of personal property devolved upon the testator's next of kin, *Gambel v. Trippe,* 75 Md. 252, 255, 23 A. 461, 462 (1892); *Henry Watson Children's Aid Soc'y v. Johnston,* 58 Md. 139, 143 (1882), unless the will contained a valid residuary clause, in which case the property passed to the residuary legatee. *Vickery v. Maryland Trust Co.,* 188 Md. 178, 52 A.2d 100 (1947); *Dulany v. Middleton,* 72 Md. 67, 19 A. 146 (1890). Void devises of real estate, on the other hand, passed to the testator's heirs, notwithstanding the presence of a residuary clause. *See, e.g., Ringgold v. Carvel,* 196 Md. 262, 268–71, 76 A.2d 327, 330–31 (1950); *Read v. Maryland Gen. Hosp.,* 157 Md. 565, 569–70, 146 A. 742, 743–44 (1929); *Orrick v. Boehm,* 49 Md. 72, 105–06 (1878); Note, *Disposition of Joint and Otherwise Failing Devises in Maryland,* 2 Md. L.Rev. 142 (1938). The Void Legacy Statute was enacted in 1969 and simplified the devolution of void or inoperative bequests by providing that all property that would be subject to a void or inoperative legacy passes under the residuary clause of a will.

Despite the different scenarios to which the Anti–Lapse Statute and the Void Legacy Statute are applicable, they essentially serve the same purpose—to provide rules for the devolution of an ineffective bequest of property in cases where the will fails to provide for an alternative disposition of that property. Because they have an identical purpose, in our view their application should be bounded by similar limits. Accordingly, as in the case of the Anti–Lapse Statute, we conclude that the Void Legacy Statute was designed to apply its saving powers to a void or inoperative bequest only when the efficacy and effect of that bequest is not otherwise "left to its own operation in law."

 *Cy pres* is a saving device applied to charitable bequests so that when the precise intention of the testator cannot be carried out, his or her intention can be carried out as near as possible. Edith L. Fisch, *The Cy Pres Doctrine in the United States* 1 (1950). *Cy pres* stems from a Norman–

French phrase meaning "so near," and is derived from the phrase "cy pres comme possible," meaning "so nearly as may be." *Miller v. Mercantile–Safe Deposit & Trust Co.*, 224 Md. 380, 383 n. 1, 168 A.2d 184 (1961). *Black's Law Dictionary* defines the doctrine as "a rule for the construction of instruments in equity, by which the intention of the party is carried out *as near as may be,* when it would be impossible or illegal to give it literal effect." *Id.* at 387 (6th ed.1990). *See also Restatement, Trusts (Second)* § 399.[8] Bogert defines *cy pres* as

> the doctrine that equity will, when a charity is originally or later becomes impossible, inexpedient, or impracticable of fulfillment, substitute another charitable object which is believed to approach the original purpose as closely as possible. It is the theory that equity has the power to revise a charitable trust where the settlor had a general charitable intent in order to meet unexpected emergencies or changes in conditions which threaten its existence.

2A Bogert, *Trusts and Trustees* § 431, *quoted with approval in Miller,* 224 Md. at 387, 168 A.2d 184. Examples of charitable purposes can be found in section 386 of the *Restatement (Second) of Trusts* (1959):

(a) the relief of poverty;

(b) the advancement of education;

(c) the advancement of religion;

(d) the promotion of health;

(e) governmental or municipal purposes;

(f) other purposes the accomplishment of which is beneficial to the community,

*quoted with approval in Rosser v. Prem,* 52 Md.App. 367, 374, 449 A.2d 461 (1982).

From the outset, Maryland imposed strict and technical requirements on the judicial enforcement of charitable trusts.

---

**8.** This is known as "judicial cy pres," as distinguished from a special branch of "prerogative cy pres" that is available in England by virtue of the royal prerogatives of the sovereign.

Section 3 in the Bill of Rights of the Maryland Constitution of 1776 provided:

> The inhabitants of Maryland are entitled to the common law of England ... according to the course of that law, and to the benefit of such of the English statutes as existed at the time of their first emigration, and which by experience have been found applicable to their local and other circumstances, and of such others as have been since made in England or Great Britain, and have been introduced, used and practiced by the courts of law and equity.

A report on the English statutes to be rejected under this provision was commissioned. This report classified the Statute of Charitable Uses, 43 Eliz., ch. 4 (1601), among those that were found inapplicable to local needs. *See generally* Steiner, *The Adoption of English Law in Maryland,* 8 Yale L.J. 353, 354 (1899).

Following this report, the Court of Appeals rejected the Statute of Charitable Uses in *Dashiell v. Attorney General,* 5 H. & J. 392 (1822). *See Miller,* 224 Md. at 385, 168 A.2d 184; *Loats Female Orphan Asylum v. Essom,* 220 Md. 11, 150 A.2d 742 (1959); *Fletcher v. Safe Deposit & Trust Co.,* 193 Md. 400, 67 A.2d 386 (1949); *Book Depository of Baltimore Annual Conference of M.E. Church v. Trustees of Church Rooms Fund,* 117 Md. 86, 91, 83 A. 50 (1912). The Court in *Dashiell* also perched its holding on the U.S. Supreme Court's contemporaneous conclusion that interpreted the Statute of Charitable Uses as furnishing the basis of the law of charitable bequests. *Trustees of Phila. Baptist Ass'n v. Hart's Ex'rs.,* 17 U.S. (4 Wheat 1), 4 L.Ed. 499 (1819). The *Baptist* Court held that charitable trusts could only be enforced by virtue of the Statute of Charitable Uses and not by the inherent powers of a court sitting in equity. The Maryland Court of Appeals, following the *Baptist* decision, concluded that "the peculiar law of charities" originated in the Statute of Charitable Uses, a statute that had not been adopted in Maryland. *Dashiell,* 5 H. & J. at 398–403. Thus, a disposition in trust for charity would fail "which if not a charity, would on general principles be void." *Id.* at 402.

A quarter-century later, the Supreme Court reversed field by holding that the inherent powers of a court of equity were sufficient in themselves to enforce a charitable trust. *Vidal v. Girard's Ex'rs*, 43 U.S. (2 How.) 127, 11 L.Ed. 205 (1844). In distinguishing its earlier opinion in *Baptist*,[9] the Court noted:

> [T]he Court came to the conclusion that, at the common laws, no donation to charity could be enforced in chancery ... where both of these defects occurred (referring to a donation to trustees incapable of taking and beneficiaries uncertain and indefinite). The Court said: 'We find no dictum that charities could be established on such an information (by the attorney-general) where the conveyance was defective or the donation was so vaguely expressed that the donee, if not charity, would be incapable of taking.'

> \* \* \*

> There are, however, dicta of eminent judges .... which do certainly support the doctrine that charitable uses might be enforced in chancery upon the general jurisdiction of the Court, independently of the statute of 43 of Elizabeth; and that the jurisdiction has been acted upon not only subsequently but antecedent to that statute.

43 U.S. at 193–94.

Despite this change of tune, the Maryland Court of Appeals, having already accepted the Supreme Court's decision in *Baptist*, was uninfluenced by the Supreme Court's about-face in *Girard's* and continued to cling to the notion that equity courts had no inherent power to enforce devises to charity

---

9. Although the opinion in *Girard's* purports to distinguish the two cases, the principle of the former case was essentially overruled. Subsequently, the Court owed up to this by noting that the effect of its decision in *Girard's* was that "the former idea" that jurisdiction was dependent on the Statute of Elizabeth "was exploded, and has since nearly disappeared from the jurisprudence of the country. Upon reading the statute carefully, one cannot but feel surprised that the doubts thus indicated ever existed." *Ould v. Washington Hosp. for Foundlings*, 95 U.S. 303, 309, 24 L.Ed. 450 (1877).

independent of the Statute of Charitable Uses.[10] It was often the case that charitable bequests were vitiated on the notion that the testator failed to manifest sufficient certainty and definiteness in the object of his bounty. *See, e.g., American Colonization Soc'y v. Soulsby,* 129 Md. 605, 99 A. 944 (1917); *Missionary Soc'y of M.E. Church v. Humphreys,* 91 Md. 131, 46 A. 320 (1900); *Maught v. Getzendanner,* 65 Md. 527, 5 A. 471 (1886); *Isaacs v. Emory,* 64 Md. 333, 1 A. 713 (1885); *Rizer,* supra; *Church Extension M.E. Church. v. Smith,* 56 Md. 362, 397 (1881); *Dumfries v. Abercrombie,* 46 Md. 172 (1877); *Needles v. Martin,* 33 Md. 609 (1871); *State v. Warren,* 28 Md. 338 (1868); *Missionary Soc. v. Reynold's, Ex'x,* 9 Md. 341 (1856); *Wilderman v. Baltimore,* 8 Md. 551 (1855); *see generally* Howard, *Charitable Trusts In Maryland,* 1 Md. L.Rev. 105 (1937).

The evolution of Maryland jurisprudence toward its current stance, whereby the enforcement of charitable bequests is vested in courts exercising their equitable powers, began near the end of the nineteenth century. The rigidity of the common law rule and the inequitable results often produced were ameliorated somewhat by the passage of the Act of 1888, ch. 249, *see Gray v. Peter Gray Orphans' Home & Mechanical Inst.,* 128 Md. 592, 601, 98 A. 902 (1916), from which ET 4–409 traces its roots. Under this Act, charitable bequests that would have been void because of an uncertainty as to the donee could be rendered effective if the will provided for the formation of a corporation to receive the bequest. The passage of the Act of 1888 prompted the Court of Appeals to break somewhat with its prior rigid adherence to the *Baptist* interpretation. *Halsey v. Convention of Protestant Episcopal Church,* 75 Md. 275, 23 A. 871 (1892).

The Statute of 43 Elizabeth in regard to charities, is not, it is true, in force here, but it is well settled that a court of chancery, has jurisdiction, independent altogether of the

---

**10.** An exception was made when land was conveyed to trustees for use as a church ground or graveyard. *Second Universalist Soc'y v. Dugan,* 65 Md. 460, 5 A. 415 (1886); *Reed v. Stouffer,* 56 Md. 236 (1881).

statute, to enforce a trust for charitable and religious purposes, provided the devise or bequest be made to a person or body corporate capable of taking and holding the property so devised and bequeathed, and provided, further, the object and character of the trust be definite and certain. *Id.* at 281–82, 23 A. 781. Nonetheless, the break with *Baptist* was far from complete. The Court continued to hold charitable trusts void for uncertainty, if such bequests did not strictly comply with the 1888 legislation. *See, e.g., Yingling v. Miller,* 77 Md. 104, 107, 26 A. 491 (1893). It reasoned:

> Now, remembering the settled law of this State prior to the legislation of 1888, namely, that this bequest would have been void for uncertainty ... can we assume that the Legislature intended, by the language just quoted, to set aside entirely the long established policy of this State in regard to charitable bequests and devises, and practically to enact here the Statute of Elizabeth? We find nothing in [the statute] which, we think, will justify us in concluding the Legislature intended to make such a radical change.

*Id.* at 107, 26 A. 491. *See also Chase v. Stockett,* 72 Md. 235, 239, 19 A. 761 (1890).

The statute was amended in 1908 to remove the bar of perpetuities from enforcement of charitable trusts, but it was not until the Act of 1931, ch. 453, that the legislature finally superseded the common law of charitable trusts by vesting courts of equity with the jurisdiction to enforce charitable trusts. *Baltimore v. Peabody Inst.,* 175 Md. 186, 192, 200 A. 375, 378 (1938).[11] This legislation, which is presently codified at ET 14–301, was enacted to remove objections to charitable trusts on the basis of the indefiniteness of beneficiaries. *Miller, supra; Rabinowitz v. Wollman,* 174 Md. 6, 197 A. 566 (1938). Therefore, the principles embodied within the Statute of Charitable Uses concerning trusts for "charitable purposes" became part of the law of this State. *See* ET 14–301(b).

---

11. Prior to the Act of 1931, Maryland jurisprudence recognized that courts of equity had the inherent power to enforce charitable gifts to corporations. *Gordon v. Baltimore,* 258 Md. 682, 267 A.2d 98 (1970).

That same Act also marked the legislature's initial recognition, albeit in a limited sense, of the doctrine of *cy pres*. *See Gordon v. Baltimore*, 258 Md. at 702, 267 A.2d 98. Chapter 291 of the Act of 1931 made the doctrine of *cy pres* applicable in cases of charitable or religious corporations which were about to be dissolved, or have their activities discontinued.[12] By the Act of 1945, ch. 727, the Maryland legislature expanded its adoption of *cy pres* by extending its applicability to charitable trusts *and bequests* that were illegal, impractical, or impossible to enforce, *see Gray v. Harriet Lane Home for Invalid Children*, 192 Md. 251, 272, 64 A.2d 102 (1949), provided the testator manifested a "general charitable intention." In 1961, the Court of Appeals recognized that the Maryland Charitable Trusts Administration Act adopted the principle of *cy pres* in its entirety. *Miller*, 224 Md. at 386, 168 A.2d 184. *See also Polster's Estate v. Commissioner*, 274 F.2d 358, 361 n. 1 (4th Cir.1960) (Sobeloff, C.J.), *quoted with approval in Gordon*, 258 Md. at 705, 267 A.2d 98. The Court in *Miller* recognized that the "statute was intended to and did provide a method by which charitable bequests that had failed might be distributable 'as nearly as possible' in a manner that would carry out the intention of the testator." 224 Md. at 386, 168 A.2d 184.

▉ Thus, by the time of the Void Legacy Statute's enactment in 1969, rules specifically addressing the administration and devolution of charitable largess had been incorporated into the Code of Maryland for almost forty years. Furthermore, the doctrine of *cy pres*, a rule of construction[13] designed to save an ineffective charitable bequest, was firmly en-

---

**12.** Even as late as 1927, the *cy pres* doctrine did not "prevail" in Maryland. Edgar G. Miller, Jr., *The Construction of Wills in Maryland* 430 (1927).

**13.** It is recognized elsewhere that *cy pres* is a rule of construction designed to enforce the intent of the testator. *Lowery v. Jones*, 272 Ark. 55, 58–59, 611 S.W.2d 759, 761 (1981); *In re Estate of Thompson*, 414 A.2d 881, 886 (1980); *Howard Sav. Inst. v. Peep*, 34 N.J. 494, 170 A.2d 39, 42 (1961); *In re Hough's Will*, 11 Misc.2d 183, 187, 172 N.Y.S.2d 669, 674 (1958); *In re Kay's Estate*, 456 Pa. 43, 317 A.2d 193, 198 (1974).

trenched in the Maryland Code. *See generally,* Sykes, *supra,* § 74 (1965 Supp.). Accordingly, by combining our conclusion that the applicability of the Void Legacy Statute is limited to saving ineffective bequests from slipping into intestacy when no other rule concerning the devolution of property applies, with our analysis of the evolution of the law of charitable bequests and the doctrine of *cy pres* in particular; we hold that an ineffective charitable bequest must first be analyzed under the *Cy Pres* Statute. Only if the doctrine of *cy pres* cannot be employed to save the bequest because either the requirements of ET 14–302 have not been met or the chancellor expressly declines to exercise his or her equitable powers under the *Cy Pres* Statute, will the provisions of ET 4–404 be brought to bear in an effort to save the bequest from slipping into the depths of intestacy.

Moreover, our survey of decisions from other jurisdictions indicates that the overwhelming weight of authority views *cy pres* as a device designed to prevent a charitable bequest from failing. *Estate of Jackson,* 92 Cal.App.3d 486, 490, 155 Cal. Rptr. 380, 381 (1979); *In re Tomlinson's Estate,* 65 Ill.2d 382, 389, 359 N.E.2d 109, 112, 3 Ill.Dec. 699, 702 (1976); *Estate of Crawshaw,* 249 Kan. 388, 396, 819 P.2d 613, 620 (1991) (quoting *In re Estate of Coleman,* 2 Kan.App.2d 567, 574, 584 P.2d 1255, *review denied,* 225 Kan. 844 (1978)); *In re Thompson's Estate,* 414 A.2d 881, 885 (1980); *Wesley United Methodist Church v. Harvard College,* 366 Mass. 247, 316 N.E.2d 620, 623 (Mass.1974); *In re Bernstrauch's Estate,* 210 Neb. 135, 139, 313 N.W.2d 264, 268 (1981); *Howard Sav. Inst. v. Peep,* 34 N.J. 494, 170 A.2d 39, 42 (1961); *City Bank Farmers Trust Co. v. Arnold,* 283 N.Y. 184, 27 N.E.2d 984, 986 (1940); *In re Folsom's Will,* 23 Misc.2d 817, 820, 199 N.Y.S.2d 571, 574 (N.Y.Sur.1960) ("The contingency of an insufficiency of funds is covered by the *cy pres* doctrine"); *Stockert v. Council on World Serv. & Fin. of Methodist Church,* 189 W.Va. 1, 2, 427 S.E.2d 236, 237 (1993). *See also In re Tarrant's Estate,* 38 Cal.2d 42, 237 P.2d 505, 506 (1951) ("A bequest intended as a charity is not void, . . . if it can possibly be made good."); *Delaware Trust Co. v. Young,* 33 Del.Ch. 357, 361, 93 A.2d

496, 499 (1952) (holding that because will did not "indicate a general charitable purpose, the intended charitable trust must fail"); *Kostarides v. Central Trust Co.*, 370 Mich. 690, 696–98, 122 N.W.2d 729, 733 (1963). *See generally* Fisch, *supra*. Other jurisdictions, while recognizing that an ineffective charitable bequest lapses, still consider whether *cy pres* can be employed to effectuate the bequest. *In re Farrow*, 412 Pa.Super. 135, 602 A.2d 1346, 1348 (1992); *Industrial Nat'l Bank v. Glocester Manton Free Public Library*, 107 R.I. 161, 265 A.2d 724 (1970) (although ineffective charitable bequest was treated as lapsed, the court still considered whether *cy pres* was applicable). Regardless of the reasoning employed, courts, implicitly at least, uniformly conclude that *cy pres* can be applied to an otherwise ineffective charitable bequest before concluding that the bequest should be treated as any other lapsed or void bequest and devolved accordingly. *See, e.g., Wachovia Bank & Trust Co. v. Buchanan*, 346 F.Supp. 665 (D.D.C.1972), *aff'd*, 487 F.2d 1214 (D.C.Cir.1973); *Delaware Trust Co. v. Young*, 33 Del.Ch. at 362, 93 A.2d at 499; *Nelson v. Kring*, 225 Kan. 499, 505, 592 P.2d 438, 444 (1979); *First Portland Nat'l Bank v. Kaler–Vaill Mem'l Home*, 155 Me. 50, 151 A.2d 708 (1959); *First Church in Somerville v. Attorney General*, 375 Mass. 332, 376 N.E.2d 1226 (1978); *Bankers Trust Co. v. New York Women's League for Animals*, 23 N.J.Super. 170, 189–90, 92 A.2d 820, 829–30 (1952); *In re Bowne's Estate*, 11 Misc.2d 597, 599, 173 N.Y.S.2d 723, 726 (1958) *Wilson v. First Presbyterian Church*, 284 N.C. 284, 200 S.E.2d 769 (1973). Indeed, some courts have expressly recognized the order of analysis that we adopt today. *Martin v. North Hill Christian Church*, 64 Ohio App.2d 192, 194, 412 N.E.2d 413, 414 (1979) ("[W]hen [the designated legacy] ceased to exist, the purpose of the trust could not be satisfied and the gift lapsed unless the aforementioned doctrines [including *cy pres* ] can be applied to save it"); *Grebenstein v. St. John's Evangelical Lutheran Church*, 3 N.J.Super. 422, 425, 66 A.2d 461, 462–63 (1949) ("In the instant case, it is clear that the testatrix did not intend to make a general bequest to the church, but confined it to [a] specific purpose of relieving the

institution of debt.... The legacy, therefore, lapses and becomes part of the residuary estate, distributable to the residuary legatees.").

Before turning to whether a general charitable intent was present in this case, we must dispose of appellant's assortment of statutory construction arguments. First, appellant contends that the Estates and Trusts Article is devoid of any language indicating that the *Cy Pres* Statute asserts exclusive control over void charitable legacies, or otherwise limits or modifies the Void Legacy Statute. Appellant, by focusing on both statutes in isolation, demonstrates a near-sighted and misguided approach to statutory construction. Ordinarily, a second statute will not be considered as a substitute for the first, regardless of the order in which they were enacted. *Baltimore v. Clerk of Superior Court of Baltimore City,* 270 Md. 316, 311 A.2d 261 (1973). Rather, Maryland courts presume that the legislature intends that related statutes be blended into a harmonious body of law, even though they were enacted at different times and *without reference to one another. State v. Crescent Cities Jaycees Found., Inc.,* 330 Md. 460, 624 A.2d 955 (1993). Nonetheless, when two provisions are added to the statutory melting pot and blended into a harmonious body of law, each statute, like all bodies of matter in the Universe, must necessarily have some impact on each other even though the first statute does not expressly make mention of the second. Accordingly, the *Cy Pres* Statute can and does impact on the effect of the Void Legacy Statute, although neither makes mention of the other.

Further, we are not persuaded that the mandatory language of the Void Legacy Statute indicates that it should trump the discretionary language of the *Cy Pres* Statute. Rather, the opposite conclusion seems more reasonable—a court may chose to apply *cy pres* when proper, but if it cannot or chooses not to, then it must seek to apply the Void Legacy Statute to a void or inoperative charitable bequest.

Appellant also contends that the Void Legacy Statute is the more specific statute and should therefore control. To

establish that the Void Legacy Statute is the more specific provision, appellant makes several assertions:

1) ET 4–404 applies where there is the failure of one of two or more legacies, whereas ET 14–302 applies in the *more common situation* of when the testator leaves the entire residuary estate to one charity;[14]

2) ET 4–404 applies only to outright bequests, not trusts, whereas ET 14–302 applies to both;

3) ET 4–404 only takes effect when a will is probated, whereas 14–302 may occur whenever a charitable gift becomes illegal, impossible, or impracticable;

4) Only residuary legatees have standing under ET 4–404, whereas an unlimited number of charities have standing under ET 14–302; and

5) ET 4–404 is limited to void or inoperative legacies, whereas 14–302 applies to legacies that fail for any reason.

In our view, the preceding contentions demonstrate only that, with some effort, any statute can be made to appear to be the more specific application over another statute. These contentions do not convince us that, in the context of an ineffective bequest, the Void Legacy Statute should trump the *Cy Pres* Statute. Rather, as we have discussed in painstaking detail, in the context of the devolution of an ineffective bequest, the *Cy Pres* Statute applies only when a charitable bequest is illegal, impossible, or impracticable to effectuate and the testator has manifested a general charitable intent. In comparison, the Void Legacy Statute applies to all other void or inoperative bequests.

Finally, Gallaudet maintains that the more recently enacted statute, the Void Legacy Statute, should control. A cardinal rule of statutory construction is not to find any word, clause, sentence, phrase, or statutory subsection superfluous, meaningless, or nugatory, unless there is some clear indication to the contrary. *Polomski, supra; DeBusk v. Johns Hopkins*

---

**14.** Appellant offers no authority for the proposition that leaving one's entire estate to one charity is "the more common situation."

*Hosp.,* 342 Md. 432, 677 A.2d 73 (1996). Whenever possible, one statute should not be read so as to render another statute meaningless. *In re Roger S.,* 338 Md. 385, 658 A.2d 696 (1995). Instead, all parts of the statute are to be reconciled and harmonized to the extent possible. *Curran v. Price,* 334 Md. 149, 638 A.2d 93 (1994); *Conaway v. State,* 108 Md.App. 475, 672 A.2d 162, *cert. denied,* 342 Md. 472, 677 A.2d 565 (1996). When attempting to harmonize two statutes that address the same subject, we presume that when the legislature enacted the later of the two statutes, it was aware of the one enacted earlier. *Government Employees Ins. Co. and GEICO v. Insurance Comm'r,* 332 Md. 124, 630 A.2d 713 (1993). Even though two statutes may require conflicting results with regard to their common subject, they are not rendered thereby necessarily irreconcilable. *Id.* Only if two statutes contain an irreconcilable conflict will the statute whose relevant statutory provisions were enacted more recently be held to have repealed by implication any conflicting provisions of the earlier statute. *Farmers & Merchants Nat'l Bank v. Schlossberg,* 306 Md. 48, 507 A.2d 172 (1986). Although the two statutes might produce conflicting results with regard to Mrs. Swindells's ineffective bequest, our analysis indicates the two statutes do not present an irreconcilable conflict. Further, there is no indication in the text or the legislative history of the Void Legacy Statute indicating that the legislature, by enacting the Void Legacy Statute, intended to repeal, or otherwise limit, the application of the *Cy Pres* Statute.

## II.

Having determined that ineffective charitable bequests must run the gauntlet of the *Cy Pres* Statute before being turned over to the rules concerning void or lapsed bequests, we now consider whether the trial court erred by concluding that the prerequisites for applying the doctrine of *cy pres* were present. Before *cy pres* can be applied to an ineffective charitable bequest, three requirements must be met: (1) a devise to charity, (2) that is illegal, impossible, or

impractical to enforce, (3) and the testator has manifested a general charitable intent. *See* ET 14–302. Appellant contends that *cy pres* should not have been applied because the testator, Mrs. Swindells, did not manifest a general charitable intent. The reason for the general charitable intent requirement is that *cy pres is theoretically based on the enforcement by the court of an actually formed and expressed intent of the testator,* and that the selection of a secondary charitable objective is not because the court thinks such a result desirable but rather because the donor desired it. Bogert & Bogert, *Trusts and Trustees,* § 436 (2d rev. ed. 1991).

In the proceedings before the circuit court, a dispute arose over the admissibility of the statements made by Mrs. Swindells to Mr. Goodman subsequent to 2 November 1994, the date she executed the will containing the ineffective bequest to the DAR Nursing Home. The following transpired at the 3 September 1996 trial:

[GALLAUDET'S COUNSEL]: [W]e are not relying on an unexecuted will, not saying that will should be probated, that will should be enforced. We are relying upon those conversations and the preparation of those subsequent wills as evidence of what Mrs. Swindells intent was and under the doctrine of *cy pres,* the [c]ourt's obligation is to ascertain what she would have wanted done with her property if she'd known that the DAR nursing home didn't exist.

In this case, we know that because she told Mr. Goodman. He took several actions in response and nothing ever contradicted that. So if the Court gets to *cy pres,* that is clearly admissible to find what was it that she intended.

\* \* \*

[W]e need under the *cy pres* statute . . . to find out whether she had a general charitable intent.

\* \* \*

For all these reasons, I believe that the evidence is admissible. . . .

THE COURT: All right. The Court's going to take a brief recess [and] will reconvene . . . and make a ruling as to the evidentiary question to which it finds itself presented at this time.

After a brief recess was taken, the court ruled as follows: THE COURT: [T]here is no uncertainty in the Court's mind as to the principle of law that should be applied regarding the admissibility of the evidence.

Quoting from *[William D. Shellady, Inc. v. Herlihy,* 236 Md. 461, 471, 204 A.2d 504 (1964) ], the Court states, ["I]t is a basic principle in the construction of wills that the intention of the testator as gathered from the four corners of the instrument is to prevail if there be apt words used to effectuate it, unless some positive principle of law is contravened or unless the testator's intention was frustrated [']by some unbending rule of construction assigning an inflexible meaning to particular words[' " (quoting *Littig v. Hance,* 81 Md. 416, 425, 32 A. 343 (1895)) ].

\* \* \*

[S]o the Court finds that as a matter of fact, that there is no ambiguity in terms of [Mrs.] Swindells'[s] intent. Her intent is to benefit the destitute members of the [DAR]. . . . So accordingly, having found no ambiguity in the device in question, the Court sees no reason to admit extrinsic evidence, nor does the Court find that extrinsic evidence should be admitted.

\* \* \*

Quoting *[Restatement (Second) of Trusts* § 399 cmt. d (1959) ],["]Under the circumstances stated in this section, the Court will direct the framing of a scheme to apply the trust property for some charitable purpose falling within the general intention as settlor. In framing a scheme, the Court will consider evidence as to what [would] probably have been the wish of the settlor at the time when he created the trust if he had realized that the particular

purpose could not be carried out. The Court will ... consider not only the language of the trust instrument but also such circumstances which indicate what would have been the probable desire of the settlor such as the character of the gifts previously made by him, [the charities in] which he had expressed [an] interest, his religious affiliations, his views on social, economic and political questions and the like.["]

So the Court will allow them for that—for the purpose of framing a scheme in the event that the Court does rule based upon the *cy pres* doctrine.

As far as we can ascertain, the trial court did not consider any extrinsic evidence, including Mrs. Swindells's post-execution statements, when determining whether Mrs. Swindells manifested the general charitable intent required for applying *cy pres* to save an ineffective charitable bequest from failing. The trial court, however, did consider extrinsic evidence, including Mrs. Swindells's post-execution statements, when trying to formulate a substitute plan for distributing the proceeds of the ineffective bequest. We recognize that the analytical framework employed by the trial judge was in step with the majority of jurisdictions that have opined on the proper mode of analysis for ascertaining whether the testator has manifested a charitable intent, and if so, how to determine a substitute plan that is as near as possible to the general charitable intent manifested by the testator.

While there is some authority to the contrary, the overwhelming majority of jurisdictions hold that a general charitable intention must be found within the four corners of the testamentary instrument and resort to extrinsic evidence may be had only in cases of ambiguity. *See generally* 15 Am. Jur.2d, *Charities* § 162 (1976); 14 C.J.S., *Charities,* § 42 (1991). Once a court concludes that a testator has manifested a general charitable intent, however, the prevailing rule permits a court in formulating a substitute plan to examine extrinsic evidence along with the language of the instrument to effectuate the donor's wishes as nearly as possible. *See*

*generally Restatement (Second) of Trusts,* § 399, cmt. d (1959); 14 C.J.S., *Charities* § 44 (1991).

Further support for the trial court's conclusion can be gleaned from ET 14–302(b), which dictates that the *Cy Pres* Statue "shall be interpreted and construed to effectuate its general purpose to make uniform the law of those states which enact it". Our research uncovered only two sister jurisdictions that have enacted the Uniform Charitable Trusts Administration Act, Oklahoma [15] and Vermont.[16] Under the common law of both states, a court, when applying its respective *Cy Pres* Statute, must initially confine its search for whether the testator has manifested a general charitable intent to the four corners of the will, and only consider extrinsic evidence if the language of the will is inconclusive. *See Matter of Shaw's Estate,* 620 P.2d 483 (Okla.App.1980); *In re Jones,* 138 Vt. 223, 415 A.2d 202, 205 (1980).

In its attempt to bolster its cause, appellee relies on *Olds v. Rollins College,* 173 F.2d 639 (D.C.Cir.1949), for the proposition that Mrs. Swindells's post-execution statements are inadmissible. There, the court, in attempting to save an ineffective bequest, expressly declined to consider evidence of the testator's post-execution conversations and letters concerning the testator's wishes in the event the bequest failed. To consider extrinsic statements of the testator's intent, the court concluded, would be tantamount to giving "testamentary effect to non-testamentary expression." 173 F.2d at 644.

Appellee also relies upon the following commentary contained in a case note on the Court's decision in *Miller:*

The weight put upon [extrinsic] evidence probably depends on how clear an answer may be obtained from a reading of the instrument itself. The difficulty in relying on evidence of this character is that it is often susceptible to several interpretations and may lead the court into adopting a more

---

15. Okla. Stat. tit. 60, §§ 601–02.

16. Vt. Stat. Ann. tit. 14, § 2328.

obvious construction to the exclusion of a less obvious but equally significant one.

Note, *The Cy–Pres Doctrine Explored,* 22 Md. L.Rev. 340, 344 (1962).[17]

 Despite the mountain of authority supporting the tack taken by the trial judge and urged upon us by appellee, we are convinced that the minority approach, which permits a court to consider the language of the instrument along with extrinsic evidence when divining whether a testator has manifested a general charitable intent, is the sounder rule for Maryland. *In re Estate of Lamb,* 19 Cal.App.3d 859, 866–67, 97 Cal.Rptr. 46, 50–51 (1971); *In re Black's Estate,* 211 Cal.App.2d 75, 91–92, 27 Cal.Rptr. 418, 428 (1962); *First Church in Somerville v. Attorney General,* 375 Mass. at 336, 376 N.E.2d at 1229–30; *Howard Sav. Inst. v. Peep,* 170 A.2d at 43. Many of the decisions that adopt the majority "four-corners approach" mechanically apply the general rules for construction of wills when searching for the presence of general charitable intent. In our view, the analytical framework relating to the construction of wills which first seeks to ascertain a testator's general intent as manifested by the language of the instrument, *see, e.g, Veditz v. Athey,* 239 Md. 435, 212 A.2d 115 (1965); *Bratley v. Suburban Bank,* 68 Md.App. 625, 515 A.2d 236 (1986), does not translate well to an equitable doctrine designed to save a charitable bequest, recognized by all as ineffective if unmodified, from failing. While it is true that *cy pres* is an intent-enforcing doctrine, "it

---

**17.** Arguably the case note's persuasive force is enhanced by the fact that its author, Alan M. Wilner, a charismatic young law student at the time, is currently a sitting associate judge on the Maryland Court of Appeals and was formerly Chief Judge of this Court. On the other hand, we note that, similar to the desired qualities of the nose, body, and color of a wine often being correlated with the acquired art of the winemaker, so too is the soundness of a legal scholar's reasoning usually linked with his experience. While recent vintages of Judge Wilner's jurisprudence have added to his reputation as a "well-respect-ed jurist" *see, e.g., Baltimore Magazine* 85, *The 200 Best Things About Baltimore* (July 1997) (bestowing upon Judge Wilner the honor of "Best Judge"), in light of Judge Wilner's then embryonic legal scholarship, 1962 may not have been an equally good year.

is a surmise rather than an actual intent which the courts enforce through application of the doctrine." *Peep, supra.* In essence, courts seeking to ascertain whether a testator has manifested a charitable intent are really asking: "If the testator had known that it would be impossible to follow the express terms of the charitable bequest, would he or she prefer to bequeath the funds to a similar charitable purpose or have his or her largess be treated like all other ineffective bequests." *See, Crawshaw,* 249 Kan. at 398, 819 P.2d at 620–21 ("[O]ur task of determining whether he had a general charitable intent could be advanced if we were able to answer two questions: First, if Crenshaw had known that Marymount College would not be in existence at the time his will was admitted to probate, would he have wanted the trusts funds to go for loans to nursing and other students generally; or second, would he have wanted the funds of his entire residuary estate to go the Salvation Army?"); *Wesley United Methodist Church v. Harvard College,* 366 Mass. at 251–52, 316 N.E.2d at 624 (1974) ("Ultimately, the question is whether the settlor would have preferred that his bequest be applied to a like charitable purpose in the event that his original scheme did not work out, or would have instead desired that the unused funds be diverted to private use."); *Howard Sav. Inst. v. Peep,* 34 N.J. at 501, 170 A.2d at 43 ("[T]he inquiry 'did the settlor manifest a general charitable intent' is just another way of asking 'would he have wanted the trust funds devoted to a like charitable purpose, or would he have wanted them withdrawn from charitable channels.' "). Even if the general analytical framework employed for construing a will is applicable in this context, a bequest that cannot be effectuated as worded must necessarily create an ambiguity, thereby permitting a court to resort to extrinsic evidence for purposes of surmising whether a testator has manifested a general charitable intent.

Furthermore, our conclusion is consistent with the Court's pronouncement in *Miller* that there are "no hard and fast rules to determine whether the intent of the testator is

general or specific." 224 Md. at 388, 168 A.2d 184. At the time of the Court's decision in *Miller,* it was well settled in this State that when construing a will, the intent of the testator was to be garnered from the meaning of the words used throughout the will. *Cole v. Bailey,* 218 Md. 177, 146 A.2d 14 (1958); *Wiesenfeld v. Rosenfeld,* 170 Md. 63, 183 A. 250 (1936); *Dickson v. Satterfield,* 53 Md. 317 (1880). If the language in the instrument was unambiguous, extrinsic evidence was inadmissible to show a testator's intent different from that disclosed by the will. *Lederer v. Safe Deposit & Trust Co.,* 182 Md. 422, 35 A.2d 166 (1943); *Farmer v. Quinn's Trust Estate,* 133 Md. 558, 105 A. 763 (1919); *Walston's Lessee v. White,* 5 Md. 297 (1853). The *Miller* Court could have easily seized upon the aforementioned "hard and fast rules" and applied this framework to its analysis of whether the testator there had manifested a general charitable intent. Instead, the Court chose to espouse a more flexible approach. Our analysis here is consistent with that approach. In addition, the *Miller* Court, when considering whether the testator manifested a general charitable intent, did not hesitate to consider a note sent by the testator to the scrivener of his will. 224 Md. at 384, 390, 168 A.2d 184. Such evidence is certainly extrinsic to the language of the instrument.

 Finally, we are mindful of the notion that Maryland courts, when construing Uniform Acts, should generally seek uniformity with decisions of other states construing the same law. *See Continental Oil Co. v. Horsey,* 177 Md. 383, 9 A.2d 607 (1939). Nonetheless, this would not be the first Maryland decision that failed to follow the legislature's exhortation to construe Uniform Acts in conformity with other states that have also enacted the same legislation. *See Blitz v. Beth Isaac Congregation,* 115 Md.App. 460, 482–86, 694 A.2d 107 (1997). In *Johnson v. Hall,* 283 Md. 644, 392 A.2d 1103 (1978), the Court was called upon to determine the proper apportionment of estate taxes among beneficiaries named in a will by applying the Uniform Estate Tax Apportionment Act as it

then appeared at ET 11–109 (1974).[18] There, the will directed that "all estate and inheritance taxes be paid as soon after my death as can lawfully and conveniently be done." Holding that the Act required clear and unambiguous language to trump the statutory presumption that taxes be apportioned among all legatees, the Court rejected the prevailing majority approach, including the approach taken by other states that had adopted the Uniform Act. *Id.* at 649–53, 392 A.2d 1103.

ET 11–109(i) (1974), the statute's uniformity provision directed:

> Such of the provisions of [section 11–109] as are uniform with statutes enacted in other states shall be so construed as to effectuate their purpose to make uniform the laws of those states which enact such provisions.

*Id.* at 653, 392 A.2d 1103. The Court noted that in enacting this provision the legislature declined to adopt the Uniform Act's provision on uniformity which provided that "[t]his Act shall be construed to effectuate its general purpose to make uniform the law of those states which enact it," Uniform Estate Tax Apportionment Act § 9 (1964 rev.), *reprinted in* 8 Uniform Laws Ann. 166 (1972). *Id.* at 653 n. 9, 392 A.2d 1103. The Uniform Act language that the court sought to distinguish is essentially identical to the language contained in ET 14–302(b), the *Cy Pres* Statute's provision on uniform construction. According to the Court of Appeals, ET 11–109(i) (1974) did "not make interpretations of the Uniform Act the only gauge for our constructional efforts but rather suggests we seek uniformity with all 'other states' that have enacted apportionment statutes containing provisions *similar* to Maryland's." *Id.*

Unlike the Court of Appeals in *Johnson,* we are unable to perceive any substantive difference in the language of the two provisions. On the other hand, we do recognize the Court's usage of indirect reasoning as a means for achieving its true

---

**18.** The Maryland Uniform Estate Tax Reapportionment Act has been recodified at Md.Code, TaxGen § 7–308 (1988 & Supp.1996).

design—to avoid being hemmed in by out-of-state authority with which it disagreed. Indeed, the Court acknowledged if it was confined to considering decisions from jurisdictions that had enacted the Uniform Act it "would have difficulty recognizing as controlling" those decisions. *Johnson,* 283 Md. at 653, 392 A.2d 1103. Most important, the *Johnson* Court characterized its divergence with out-of-state Uniform Act authority as a difference in the construction of the language in the will, not in the construction of the statute. Similarly, the rule we articulate today concerning the proper analytical framework to be applied in determining whether a testator has manifested a general charitable intent does not involve construction of the Maryland Uniform Charitable Trusts Administration Act. Rather, it is more akin to the proper manner in which a will should be construed. Finally, we note that the Uniform Charitable Trusts Administration Act has only been adopted in two other jurisdictions. Thus, in cases where the Court has not spoken directly on a particular issue, we are reluctant to confine the sources from which we can seek guidance to such a limited number of other jurisdictions.

Based on our conclusion that extrinsic evidence should be considered in conjunction with the language of a will when determining whether a testator has manifested a general charitable intent, remand is appropriate to enable the trial judge to apply the correct analytical framework as declared here.[19] Furthermore, we harbor some additional concerns

---

**19.** In order to provide the trial court with some additional guidance upon remand, we note that there is little force to appellant's argument that the specificity and uniqueness of Mrs. Swindells's bequest to the DAR Nursing Home manifested a specific, rather than a general, charitable intent. The mere fact that the class of persons whom the testator sought to benefit is narrowly circumscribed does not preclude a finding of general charitable intent. *Wesley United Methodist Church v. Harvard College,* 316 N.E.2d at 624. For example, in *Kelly v. Guild,* 42 Ill.App.2d 143, 191 N.E.2d, 377, 384 (1963), a will bequeathed a portion of an estate as follows:

To the Trustees of Old Peoples Home Trust, of Kankakee, Illinois, to be used in establishing an old peoples home in accordance with the purpose of said trust.

that Mrs. Swindells's post-execution statements might be afflicted with other, threshold evidentiary ailments, including hearsay problems. These potential issues have not been briefed in any detail by the parties here and our own non-exhaustive research failed to uncover any clear answers. On remand, we encourage the parties and the trial court to explore further the evidentiary issues concerning Mrs. Swindells's post-execution statements as related to or by Mr. Goodman.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE DIVIDED EVENLY BETWEEN GALLAUDET AND THE DAR.

---

The *Kelly* Court concluded that the phrase "to be used in establishing an old peoples home" evidenced a general charitable intent. The court determined that the "old people" of Kankakee were to be the general class to be benefitted by the bequest. 191 N.E.2d at 384. One indicia of charitable intent, therefore, is when the general charitable purpose of the gift is predominant and the particular mode for effectuating that gift is merely incidental. *See, e.g., Estate of Klinkner,* 85 Cal.App.3d 942, 951, 151 Cal.Rptr. 20, 26 (1978); *Kelly v. Guild,* 42 Ill.App.2d 143, 191 N.E.2d at 384; *In re Estate of Thompson,* 414 A.2d 881, 886; *Wesley United Methodist Church v. Harvard College,* 316 N.E.2d at 624; *In re Koons' Will,* 206 Misc. 856, 859, 135 N.Y.S.2d 733, 736 (1954). Furthermore, the fact that the testator did not know anything about the particular agency designated to administer the charitable bequest, i.e., the DAR *Nursing Home,* demonstrates a broader charitable purpose. *In re Estate of Lamb,* 19 Cal.App.3d 859, 867, 97 Cal.Rptr. 46, 49 (1971).